**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION**



Eastern District of Kentucky
FILED
FEB 26 2026
AT COVINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| T.J. ROBERTS; ZACHARY COCKRELL; MERIDIAN ORDNANCE LLC; BUCKEYE FIREARMS ASSOCIATION, INC.; CENTER FOR HUMAN LIBERTY; JEWS FOR THE PRESERVATION OF FIREARMS OWNERSHIP; and AMERICAN SUPPRESSOR ASSOCIATION FOUNDATION, INC., | : : : : : : : | No. 2:26-cv-91-SCM |
| *Plaintiffs,* | : : |  |
| v. | : : | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; DANIEL P. DRISCOLL, in his official capacity as Acting Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; UNITED STATES DEPARTMENT OF JUSTICE; and PAMELA J. BONDI, in her official capacity as Attorney General of the United States, | : : : : : : : : | |
| *Defendants.* | : |  |

Plaintiffs T.J. Roberts, Zachary Cockrell, Meridian Ordnance LLC ("Meridian Ordnance"), Buckeye Firearms Association, Inc. ("BFA"), Center for Human Liberty ("CHL"), Jews for the Preservation of Firearms Ownership ("JPFO"), and American Suppressor Association Foundation, Inc. ("ASAF," and together with BFA, CHL, and JPFO, "Organizational Plaintiffs"), through undersigned counsel, bring this Complaint against the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), Daniel P. Driscoll, in his official capacity as Acting Director of the ATF, the United States Department of Justice ("DOJ"), and Pamela J. Bondi, in her official capacity as Attorney General of the United States, and allege as follows:

## **INTRODUCTION**

1.     The National Firearms Act of 1934 ("NFA"), Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5801–5872), established a $200 tax (when adopted, approximately $5,000 in today's dollars) on, among other things, the making and transfer of certain classes of firearms, as well as a comprehensive registration regime meant to facilitate enforcement of the tax. The NFA and its implementing regulations require an individual seeking to make, transfer, or receive those firearms to provide information such as name, home address, photograph, date of birth, demographic information, fingerprints, and a detailed description of the firearms, including their quantity and physical location. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84. Congress passed the NFA explicitly premised on its enumerated power to "lay and collect Taxes," U.S. CONST. art. I, § 8, cl. 1, and the Supreme Court upheld provisions of the NFA on that basis, holding that the NFA's tax on dealers was "only a taxing measure" and that dealer-registration provisions related to that tax were "obviously supportable as in aid of a revenue purpose," *see Sonzinsky v. United States*, 300 U.S. 506, 513 (1937). Indeed, the Court has described the NFA as "an interrelated statutory system *for the taxation* of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968) (emphasis added). That constitutional basis, however, has recently been eliminated with respect to the making, transferring, and receiving of several items that are defined as "firearms" by the NFA, including suppressors, short-barreled rifles, and short-barreled shotguns, thus making the NFA's restrictions on those items unconstitutional as applied to those arms.

2.     The One Big Beautiful Bill Act ("OBBB"), Pub. L. No. 119-21, 139 Stat. 72 (2025), signed into law by the President on July 4, 2025, eliminated the making and transfer taxes on suppressors, short-barreled rifles, short-barreled shotguns, and NFA-defined "any other weapons,"

while leaving the registration requirements intact. In other words, individuals no longer are taxed for making and transferring most firearms under the NFA, but the firearms are still required to be registered and are subject to the "web of regulation" that was designed to "aid[ ] enforcement" of the NFA's (now-extinct) tax. *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972); *see also United States v. Thompson*, 361 F.3d 918, 921 (6th Cir. 2004) (internal quotation marks and citation omitted). This regulatory regime no longer comports with Congress's constitutionally enumerated powers. While the NFA's regulations may have been permissible in support of the statute's taxes on making and transferring firearms, that justification no longer remains for items whose making and transfer are no longer taxed. To the extent that the NFA imposes requirements on making, transferring, receiving, possessing, or otherwise using untaxed firearms, it cannot be justified as an exercise of any other Article I power. Accordingly, the NFA is unconstitutional as to the untaxed firearms.

3.　　Wholly apart from the NFA's constitutional infirmity in the above respect, the NFA's restrictions also constitute an unconstitutional regulatory scheme as pertains to suppressors and short-barreled rifles under the Second Amendment. Under *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), the Second Amendment presumptively protects the People's right to keep and bear all arms. If an item qualifies as an "arm," the Second Amendment protects to it, and the government bears the burden of proving, at a minimum, that there is a historical tradition of regulating arms to support the challenged regulatory scheme. Firearms equipped with suppressors and short-barreled rifles are "arms" as a matter of plain text. As a matter of history, these arms are neither dangerous nor unusual, and because there is no tradition of requiring the registration and attendant regulation of protected arms, the NFA's regulatory scheme

3

is unconstitutional under the Second Amendment with respect to suppressors and short-barreled rifles.[1]

4.      Plaintiffs are individuals and entities that are subject to (or have members who are subject to) the NFA's regulatory requirements pertaining to untaxed firearms. Plaintiffs seek a judgment declaring that the NFA is unconstitutional with respect to the untaxed firearms it purports to regulate and enjoining enforcement of the unconstitutional provisions and any related regulations. Additionally, Plaintiffs seek a judgment declaring that the NFA is unconstitutional with respect to suppressors and short-barreled rifles under the Second Amendment to the United States Constitution and enjoining enforcement of the unconstitutional provisions and any related regulations.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States.

6.      Plaintiffs seek equitable relief to prevent federal officers and entities from acting unconstitutionally. *See Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010).

---

[1] Although in the early 1970s the Sixth Circuit, without discussion in a per curiam opinion, rejected a Second Amendment challenge to the NFA with respect to short-barreled shotguns and held that the NFA is consistent with the Commerce Clause, *see United States v. Wilson*, 440 F.2d 1068 (1971), *Wilson* does not control here. First, the Supreme Court's reinvigoration of the limits on the Commerce Clause beginning in *United States v. Lopez*, 514 U.S. 549 (1995), has undermined the precedential value of *Wilson*'s Commerce Clause holding. *See Hall v. Eichenlaub*, 559 F. Supp. 2d 777, 782 (E.D. Mich. 2008) (explaining that where "an intervening Supreme Court [decision] undermine[s]" a binding Sixth Circuit precedent, the district court would not be "bound to follow the Sixth Circuit's holding in that case"); *see also Smyer v. Kroger Ltd. P'ship I*, 2024 WL 1007116, at *8 (6th Cir. Mar. 8, 2024) (Boggs, J., concurring). Second, Plaintiffs do not bring a Second Amendment claim with respect to short-barreled shotguns, and in any event, *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *Bruen*, 597 U.S. 1, have undermined *Wilson*'s precedential value in this respect.

7.     This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. §§ 2202, 2412.

8.     The Anti-Injunction Act, 26 U.S.C. § 7421, does not bar this suit because it challenges the NFA only with respect to untaxed items. Furthermore, and accordingly, it seeks not to restrain the collection or assessment of any tax but instead to restrain information-gathering and other requirements that previously were meant to support the now-defunct tax regime. The suit therefore is not brought "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a); *see CIC Servs., LLC v. IRS*, 593 U.S. 209, 211 (2021).

9.     Venue is proper in this Court because Defendants are officers, agencies, and departments of the United States, no real property is involved in this action, and Plaintiff T.J. Roberts resides in this judicial district. *See* 28 U.S.C. § 1391(e)(1).

## PARTIES

10.     Plaintiff T.J. Roberts is a citizen of the United States and a resident of Boone County, Kentucky, within this district. Roberts is over the age of 21 and is eligible to purchase and possess firearms under state and federal law. Roberts is a firearms owner, a member of BFA, CHL, and JPFO, and a supporter of the right to keep and bear arms.

11.     Plaintiff Zachary Cockrell (together with Roberts, "Individual Plaintiffs") is a citizen of the United States and a resident of Madison County, Kentucky. Cockrell is over the age of 21 and is eligible to purchase and possess firearms under state and federal law. Cockrell is a firearms owner, a member of BFA, CHL, and JPFO, and a supporter of the right to keep and bear arms.

12.     Plaintiff Meridian Ordnance is a veteran-owned limited liability company formed under the laws of Kentucky in 2011, with its principal place of business in Mt. Sterling, Kentucky,

within Montgomery County. It is a federally licensed firearms dealer under the Gun Control Act and is licensed to sell NFA items under the NFA. It is a member of BFA, CHL, and JPFO. In addition to its custom gunsmithing, manufacturing, refinishing services, and sales of non-NFA firearms, Meridian Ordnance sells all types of NFA firearms, including suppressors, short-barreled rifles, short-barreled shotguns, and devices in the "any other weapon" category.[2] Meridian Ordnance incurs significant regulatory costs in order to comply with the NFA's registration requirements in selling these firearms. For example, the NFA imposes burdensome recordkeeping requirements on Meridian Ordnance to sell NFA-covered firearms. In addition, Meridian Ordnance has lost sales because of the NFA's registration requirements, including sales to residents of Kentucky. Prospective and repeat customers have declined to purchase NFA firearms because the NFA requires them to submit personally identifying information to the federal government and go through the intrusive, time-consuming registration process. These sales to prospective and repeat customers would have occurred but for the NFA's registration scheme. Consequently, Meridian Ordnance loses potential customers and business revenue because of the NFA's registration requirements. If it were not a violation of federal law to do so, Meridian Ordnance would sell

---

[2] The NFA defines "any other weapon" as

> any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

26 U.S.C. § 5845(e).

suppressors, short-barreled rifles, short-barreled shotguns, and devices categorized as "any other weapon" without complying with the challenged NFA provisions.

13.    Individual Plaintiffs and Meridian Ordnance's customers value their personal privacy and do not want the federal government to obtain identifying information about their personally owned firearms, including information such as their names, home addresses, photographs, dates of birth, demographic information, fingerprints, and a detailed description of their firearms, including their quantity and physical locations. Federal law, however, currently requires that Individual Plaintiffs and Meridian Ordnance's customers provide all of this intrusive personally identifying information to the federal government for them legally to make, transfer, or receive items defined and regulated as "firearms" under the NFA through its registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84. Individual Plaintiffs and Meridian Ordnance's customers object to this burdensome registration requirement, which forces them to provide information to the federal government similar to that obtained from an individual arrested and charged with a crime. For these reasons, Meridian Ordnance's customers have declined to purchase NFA firearms from the business, thereby causing Meridian Ordnance to lose business revenue.

14.    Complying with the NFA's byzantine registration requirements as a precondition to lawfully making, transferring, or receiving the covered firearms imposes a significant regulatory burden on firearm owners such as Individual Plaintiffs and on NFA special occupational taxpayers like Meridian Ordnance. For example, to register a firearm regulated by the NFA, Individual Plaintiffs must spend time completing the application forms issued by the ATF and then wait for the ATF to issue an approval determination, enter their registration information, and authorize their possession of the firearm. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OMB

No. 1140-0014, Form 1 (5320.1): Application to Make and Register a Firearm (2022), https://perma.cc/RZ5B-5Q5Y; Bureau of Alcohol, Tobacco, Firearms & Explosives, OMB No. 1140-0014, Form 4 (5320.4): Application for Tax Paid Transfer and Registration of Firearm (2023), https://perma.cc/963W-KTYE. This registration process burdens Meridian Ordnance as well. To sell firearms regulated by the NFA, Meridian Ordnance must either assist its customers with the registration forms or complete them on the customers' behalf and must keep extensive records on each NFA firearm sale.

15.    Collecting the information required by these forms and completing them can take significant time, and Individual Plaintiffs and Meridian Ordnance must then wait what could be months for the ATF to enter their or the customers' registration information and issue an approval determination. *See Current Processing Times*, Bureau of Alcohol, Tobacco, Firearms & Explosives, https://perma.cc/XNZ7-UZUR (last updated Feb. 12, 2026). Indeed, it took nearly five months for ATF to approve Roberts' first suppressor purchase and about nine months for ATF to approve Cockrell's first short-barreled rifle purchase. The ATF itself has acknowledged the burdens that the NFA's registration regime imposes on lawful firearms owners, publicly stating that "registering firearms . . . under the NFA will impose a time burden." Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478, 6563 (Jan. 31, 2023) (to be codified at 27 C.F.R. pts. 478, 479).

16.    To comply with the NFA's requirements, Individual Plaintiffs must also incur costs arising from providing their fingerprints and photographs with each NFA registration application. Individual Plaintiffs have in fact incurred these time and monetary costs in the past from registering suppressors and/or short-barreled rifles with the ATF.

17. Given the OBBB's reduction of the NFA's excise tax for the majority of covered firearms to $0, Individual Plaintiffs plan to take a number of actions with respect to NFA-covered firearms.

18. Roberts wants to acquire additional suppressors for his firearms but has declined to do so because of the challenged NFA provisions. Roberts also wants to reconfigure two pistols that he currently lawfully owns—specifically, a Sig Sauer Rattler and a Geissele Super Duty—into short-barreled rifles. Finally, Roberts wants to acquire a short-barreled rifle, a short-barreled shotgun, and a firearm that qualifies as "any other weapon" under the NFA (such as a smooth-bore pistol or a combination shotgun/rifle barrel firearm). Roberts would take all of these actions within 30 days if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Were Roberts to take these actions without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Roberts will not acquire his desired additional suppressors, reconfigure any of his pistols, or acquire a short-barreled rifle, short-barreled shotgun, or firearm that qualifies as "any other weapon" under the NFA unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions.

19. Cockrell wants to acquire additional suppressors, additional short-barreled rifles, short-barreled shotguns, and firearms that qualify as "any other weapon" under the NFA—including, specifically, a smooth-bore pistol, like the Serbu Shorty—but has declined to do so because of the challenged NFA provisions. Cockrell also wants to make suppressors, convert some of his lawfully owned firearms into short-barreled rifles and short-barreled shotguns, and make firearms that qualify as "any other weapon" under the NFA without complying with the challenged NFA provisions. Cockrell would take all of these actions within 30 days if it were not a violation

9

of federal law to do so without complying with the challenged NFA provisions. Were Cockrell to take these actions without complying with those provisions, he would face arrest, prosecution, and imprisonment for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, Cockrell will not purchase or make/convert his desired suppressors, short-barreled rifles, short-barreled shotguns, or firearms that qualify as "any other weapon" under the NFA unless it would not be a violation of federal law for him to do so without complying with the NFA's registration provisions.

20.    Plaintiff Buckeye Firearms Association, Inc. is a nonprofit, grassroots social welfare organization dedicated to the defense and advancement of the fundamental right of citizens to possess and utilize firearms for all lawful purposes. BFA actively promotes pro-firearms legislation, provides public education, and facilitates industry-leading firearms training and resources. BFA brings this action on behalf of its members, including Individual Plaintiffs and Meridian Ordnance, who are adversely and directly harmed by Defendants' enforcement of the NFA.

21.    Plaintiff Center for Human Liberty is a nonprofit organization dedicated to defending and advancing individual liberty and freedom, including the rights and liberties protected by the Constitution. Consistent with this purpose, CHL engages in legal efforts to promote the protection of liberty. CHL brings this action on behalf of its members, including Individual Plaintiffs and Meridian Ordnance, who are adversely and directly harmed by Defendants' enforcement of the NFA.

22.    Plaintiff Jews for the Preservation of Firearms Ownership is a nonprofit educational civil rights corporation focused on firearms ownership and responsibility. Its work centers on the history of gun control. Founded by Jews in 1989, JPFO initially aimed at educating the Jewish

10

community about the historical evils that Jews have suffered when they have been disarmed. JPFO welcomes people of all religious beliefs who share a common goal of opposing and reversing victim-disarmament policies while advancing liberty for all. JPFO brings this action on behalf of its members, including Individual Plaintiffs and Meridian Ordnance, who are adversely and directly harmed by Defendants' enforcement of the NFA.

23.     Plaintiff American Suppressor Association Foundation, Inc. is a nonprofit dedicated to educating the public on the hearing safety and other practical benefits of firearm suppressors. ASAF wants to acquire suppressors to use as demonstrative aids as part of its educational activities but has declined to do so because of the challenged NFA provisions. ASAF would acquire these suppressors within 30 days if it were not a violation of federal law to do so without complying with the challenged NFA provisions. Were ASAF to take these actions without complying with those provisions, it would face prosecution for felony violations of federal law. *See* 26 U.S.C. §§ 5861, 5871. Consequently, ASAF will not acquire its desired suppressors unless it would not be a violation of federal law for it to do so without complying with the NFA's registration provisions.

24.     Defendant Bureau of Alcohol, Tobacco, Firearms and Explosives is a component of the DOJ and is headquartered at 99 New York Avenue, Northeast, Washington, DC 20226. The ATF is delegated authority to enforce federal firearm laws, including the NFA's taxation and registration provisions. *See* 28 U.S.C. § 599A; 28 C.F.R. § 0.130; 18 U.S.C. § 926(a). The ATF receives and processes NFA-related registration applications, issues approval determinations on those applications, and maintains the National Firearms Registration and Transfer Record, the central registry of all NFA-regulated firearms that "are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a).

11

25.     Defendant Daniel P. Driscoll is the Acting Director of the ATF and is responsible for overseeing the Agency's enforcement of the NFA's taxation and registration provisions. *See* 28 C.F.R. § 0.130(a)(1)–(3); 28 U.S.C. § 510. Acting Director Driscoll is being sued in his official capacity.

26.     Defendant Department of Justice is headquartered at 950 Pennsylvania Avenue, Northwest, Washington, DC 20530. The DOJ is the executive department with authority to enforce federal laws, including the NFA's taxation and registration provisions.

27.     Defendant Pamela J. Bondi is the United States Attorney General. She oversees the DOJ. 28 U.S.C. §§ 501, 503. She is vested with authority to enforce federal firearms laws, including the provisions of the NFA at issue in this case. *See* 26 U.S.C. § 7801(a)(2). Attorney General Bondi is being sued in her official capacity.

## STATUTORY AND CONSTITUTIONAL FRAMEWORK

### I.     The National Firearms Act.

28.     The NFA imposed a $200 excise tax on the making and transfer of what it defines as "firearms." *See* 26 U.S.C. §§ 5811, 5821, 5841. The maker or transferor must pay the tax. *See id.* §§ 5811(b), 5821(b).

29.     The NFA also creates a burdensome registration scheme that a maker, transferor, or transferee must comply with to lawfully make, transfer, or receive the firearm. *See id.* §§ 5812, 5822, 5841, 5861; 27 C.F.R. §§ 479.62, 479.84. Before making or transferring a firearm, the maker or transferor is required to provide to the ATF extensive, intrusive, personally identifying information such as the maker or transferee's name, home address, photograph, date of birth, demographic information, and fingerprints, along with a detailed description of the firearms in question, including their quantity and physical location, to be entered into a central registry, the

National Firearms Registration and Transfer Record. *See* 26 U.S.C. §§ 5812, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

30.     Among other items, the NFA's definition of "firearm" applies to suppressors, short-barreled rifles, short-barreled shotguns, and "any other weapon." *See* 26 U.S.C. § 5845(a).

31.     The NFA imposes severe penalties on any person who transfers, receives, or even possesses a covered firearm that is unregistered or untaxed according to its requirements, including imprisonment up to 10 years and fines up to $250,000 for individuals and $500,000 for organizations. 26 U.S.C. §§ 5861 (unlawful acts), 5871 (penalties); 18 U.S.C. § 3571(b)(3), (c)(3) (fines). Indeed, as the Fifth Circuit has explained, the NFA's provisions "have teeth" and carry "severe consequences." *Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023); *see also United States v. Springer*, 609 F.3d 885, 889 (6th Cir. 2010) (recognizing that violations of the NFA subject defendants to severe fines and imprisonment of up to 10 years).

32.     Moreover, "[a]ny firearm involved in any violation" of the NFA "shall be subject to seizure and forfeiture." 26 U.S.C. § 5872(a).

33.     The challenged NFA provisions apply to all covered firearms regardless of whether they traveled in interstate commerce; these provisions contain no interstate commerce "jurisdictional hook." Consequently, the challenged NFA provisions apply equally to a firearm an individual makes in that person's home and a firearm made by a national company and shipped to a customer across state lines. The lack of an interstate commerce jurisdictional hook in the challenged NFA provisions makes them markedly different than other federal firearm statutes. For instance, the Gun Control Act of 1968—contained in Title 18 of the United States Code—explicitly regulates "interstate commerce." *See, e.g.*, 18 U.S.C. §§ 921(a)(2), 922(a)(1), (k), (n). And it

contains specific Congressional findings about the relationship between the firearms industry and interstate commerce in that context. *Id.* § 922(q)(1).

34.     Congress passed the NFA in 1934 specifically premised on its enumerated power to "lay and collect Taxes." U.S. CONST. art. I, § 8, cl. 1.

35.     Attorney General Homer Cummings, the initial lead spokesman for the bill, explained that Congress has "no inherent police powers to go into certain localities and deal with local crime," but that "[i]t is only when we can reach those things under . . . the power of taxation, that we can act." *National Firearms Act: Hearings Before the H. Comm. on Ways & Means on H.R. 9066*, 73d Cong., 2d Sess. 8 (1934) (statement of Homer Cummings, Att'y Gen. of the United States) [hereinafter *National Firearms Act Hearings*]. Attorney General Cummings further explained that "[i]f [Congress] made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say '[w]e will tax the machine gun' . . . you are easily within the law." *Id.* at 19. Assistant Attorney General Joseph Keenan explained during the same hearing that the proposed law "follows the theory of taxation all the way through," and that the reason the Attorney General's office did not propose a bill that simply banned these weapons was that Congress does not have "the power to do that under the Constitution of the United States." *Id.* at 86, 100 (statement of Joseph B. Keenan, Asst. Att'y Gen. of the United States). And in responding to objections from an industry witness, a Representative explained that "[i]f you take away the tax feature entirely, this bill goes out of the picture." *Id.* at 157 (statement of Rep. Samuel B. Hill).

36.     The Supreme Court upheld the NFA's occupational tax on dealers against constitutional challenge in 1937, holding that the NFA was "only a taxing measure," and thus

lawful pursuant to Congress's taxing power, and that the dealer-registration provisions were "obviously supportable as in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513.

37.    In 1968, Congress expanded the scope of the NFA. Originally, the NFA regulated only the transfer of covered firearms. But in the National Firearms Act Amendments of 1968, Pub. L. No. 90-618, § 5822, 82 Stat. 1213, 1228 (codified at 26 U.S.C. § 5812(1), (6)), Congress also subjected persons who "[m]ake" their own covered firearms to the NFA's tax and regulatory scheme. *Id.* Thus, Congress extended the NFA tax to activities that could be undertaken alone, with no plausible relation to commerce of any kind, much less interstate commerce.

## II.    The One Big Beautiful Bill Act.

38.    Congress passed the One Big Beautiful Bill Act on July 3, 2025, and the president signed it into law on July 4, 2025.

39.    The OBBB eliminates the NFA's $200 making and transfer tax on all NFA firearms except for machineguns and "destructive devices." OBBB § 70436.

40.    The elimination of the tax applies to "calendar quarters beginning more than 90 days after the date of the enactment of this Act," or, in other words, the elimination became effective on January 1, 2026. *Id.* § 70436(d).

## III.    The Second Amendment and NFA-Covered Firearms.

41.    The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. This constitutional provision, at minimum, guarantees the law-abiding citizens of this Nation the fundamental right to keep and bear arms for defense of self and family and for all other lawful pursuits.

42.    In *Bruen*, the Supreme Court stated the test for Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution

presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24.

43.     The plain text of the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 28 (quoting *Heller*, 554 U.S. at 582). The Supreme Court has defined "arms" under the Second Amendment broadly with a "general definition" that includes all "modern instruments that facilitate armed self-defense." *Id.*

44.     Despite this constitutional guarantee, Congress has enacted, and Defendants enforce, an unconstitutional regulation of suppressors and short-barreled rifles.

A.     **Suppressors Are Second Amendment–Protected Arms.**

45.     A suppressor is a safe, effective, and commonly used device that decreases the noise level of a gunshot. Suppressors improve the experience and use of firearms. They decrease the risk of permanent hearing damage, help protect the hearing of hunters and those nearby, reduce noise pollution from firearm discharge, make firearms training safer and more effective, increase the accuracy and ease of use of firearms by reducing felt recoil and shot flinch, and improve the effectiveness of firearms for self-defense and defense of the home. Contrary to representations in movies and television, suppressors do not reduce all sound from a gunshot and are rarely used by criminals.

46.     While suppressors are sometimes referred to as "silencers," suppressors do not silence firearms. "[T]he term 'silencer' is a misnomer, in that—despite movie fantasies—a noise suppressor reduces decibels, but does not actually 'silence' the discharge of a firearm." Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46

16

CUMB. L. REV. 35, 36 (2016) [hereinafter *Firearm Sound Moderators*]; *see also* AM. SUPPRESSOR ASS'N, *The American Suppressor Association (ASA)* (YouTube, Nov. 26, 2014), https://bit.ly/45aP0qe (demonstrating the use of suppressors and their decibel level reduction). The sound from a suppressed firearm "may be muffled or diminished," but "it can still be heard" easily. *Firearm Sound Moderators*, at 36; *see also United States v. Bolatete*, 977 F.3d 1022, 1028 (11th Cir. 2020) (referring to "suppressors or silencers" as "the same thing"). Indeed, suppressed firearms are still quite loud.

47.    The NFA's regulation of suppressors implicates the Second Amendment's plain text. By regulating suppressors, the NFA effectively regulates suppressed firearms, and suppressed firearms are "arms." Alternatively, suppressors facilitate armed self-defense by enhancing the effectiveness of firearms for self-defense and mitigating the hearing risks associated with using firearms.

48.    The government agrees that suppressors are protected by the text of the Second Amendment. *See* Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Mot. for Summ. J. at 28–32, *Brown v. ATF*, No. 4:25-cv-01162-SRC (E.D. Mo. Dec. 17, 2025), ECF No. 33; Defs.' Answer to Pls.' Compl. ¶¶ 48–50, *Brown v. ATF*, No. 4:25-cv-01162-SRC (E.D. Mo. Oct. 10, 2025), ECF No. 19; Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Mot. for Summ. J. at 28–33, *Jensen v. ATF*, No. 2:25-cv-00223-Z (N.D. Tex. Dec. 19, 2025); Gov't Suppl. Resp. to Def.'s Pet. for Reh'g En Banc at 1, *United States v. Peterson*, No. 24-30043 (5th Cir. May 29, 2025), ECF No. 135 [hereinafter Gov't *Peterson* Br.] ("In the view of the United States, the Second Amendment protects firearm accessories and components such as suppressors."); *see also id.* at 2–5.

49.    Therefore, by forcing Plaintiffs (and their members) to comply with the NFA to possess suppressors, Defendants have burdened the right to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. amend. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

50.    Defendants cannot demonstrate any such thing. *Heller* and *Bruen* have provided the sole historical tradition that can remove an arm from the Second Amendment's protective scope—the tradition of restricting the use of dangerous and unusual weapons. *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–48. To be banned, a firearm must be "*both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring in the judgment) (emphases in original). And if a firearm cannot be banned, because it is not *both* dangerous *and* unusual, it can be regulated only if there is a historical tradition of doing so. Suppressors are neither dangerous nor unusual. Arms that are in common use, like those equipped with suppressors, cannot be unusual. And suppressors, which increase the safety of a firearm and have been deemed necessary to the safest use of a firearm, cannot be dangerous. Nor is there a historical tradition that supports the NFA's comprehensive registration scheme for protected arms.

51.    Suppressors do not meet the Supreme Court's threshold for banning or regulating arms, so the NFA's registration scheme as to suppressors must be held unconstitutional.

### i.    Suppressors are in Common Use.

52.    Suppressors have been broadly permitted and commonly used for over one hundred years. In 1908, Hiram Percy Maxim applied to patent a device that could be attached to a firearm to reduce gunshot noise. He dubbed his invention a "silencer." Silent Firearm, U.S. Patent No. 958,935 (filed Nov. 30, 1908), https://perma.cc/5TPE-PSZ7. Several years later, Maxim explained

18

that he invented the device to reduce sound disturbance caused by firearms. HIRAM PERCY MAXIM, EXPERIENCES WITH THE MAXIM SILENCER 2–4 (1915), https://perma.cc/WY37-3YE2 [hereinafter MAXIM]. President Theodore Roosevelt possessed a suppressor, the Maxim Silencer. Max Slowik, *Teddy Roosevelt's Suppressed 1894 Winchester*, GUNS.COM (May 18, 2012), https://perma.cc/3G38-C5XQ.

53.    The common use of suppressors has continued into the modern day. Millions of suppressors are owned by Americans, in steadily increasing numbers. As of May 2021, Americans had registered nearly 2.7 million suppressors with the ATF. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: ANNUAL STATISTICAL UPDATE 2021, at 16 (2021), https://perma.cc/4WAF-QGPQ [hereinafter ATF STATISTICAL UPDATE 2021]. As of May 2024, ATF reported over 3.5 million registered suppressors. *See* BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, FIREARMS COMMERCE IN THE UNITED STATES: STATISTICAL UPDATE 2024, at 12 (2024), https://perma.cc/DJC5-VBJZ [hereinafter ATF STATISTICAL UPDATE 2024]. More recent ATF data indicates that by the end of 2024 there were approximately 4.5 million registered suppressors. *See* NAT'L SHOOTING SPORTS FOUND., SUPPRESSOR OWNER STUDY 7 (2025), https://perma.cc/HV5A-7APV. And as of January 28, 2026, there were 5,791,644 registered suppressors.

54.    Suppressors are widely permitted throughout the United States. Forty-two states permit their citizens to possess and use suppressors. And the NFA allows individuals to make, transfer, or receive suppressors subject to its onerous, invasive registration requirements. *See* 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841; 27 C.F.R. §§ 479.62, 479.84.

## ii. Suppressors Have Many Lawful, Safe, and Common Uses.

55.     Suppressors have many common, legal uses. Firearm suppressors are commonly used for lawful purposes and very infrequently used for criminal activity. Although not required under the Second Amendment, suppressors *increase* the safety of firearm use.

56.     First, suppressors are commonly used for hearing protection. Suppressors are one of the best and most effective forms of hearing protection for firearms use. The American Academy of Otolaryngology-Head and Neck Surgery, the National Hearing Conservation Association Task Force on Prevention of Noise-Induced Hearing Loss from Firearm Noise, the Centers for Disease Control and Prevention, and the Academy of Doctors of Audiology have all recommended the use of suppressors for hearing protection. *See Suppressors for Hearing Preservation*, AM. ACAD. OTOLARYNGOLOGY-HEAD & NECK SURGERY (Nov. 18, 2024), https://perma.cc/X4AK-4DZZ; Michael Stewart et al., *NHCA Position Statement: Recreational Firearm Noise*, NAT'L HEARING CONSERVATION ASS'N (Mar. 16, 2017), https://perma.cc/RB6V-V7JV; LILIA CHEN & SCOTT E. BRUECK, NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2011-0069-3140, NOISE AND LEAD EXPOSURES AT AN OUTDOOR FIRING RANGE – CALIFORNIA 5 (2011), https://perma.cc/8C62-Z42R; SCOTT E. BRUECK ET AL., NAT'L INST. FOR OCCUPATIONAL SAFETY & HEALTH, CTRS. FOR DISEASE CONTROL & PREVENTION, HHE REP. NO. 2013-0124-3208, MEASUREMENT OF EXPOSURE TO IMPULSIVE NOISE AT INDOOR & OUTDOOR FIRING RANGES DURING TACTICAL TRAINING EXERCISES 14 (2014), https://perma.cc/UQF7-DH5Q; Letter from Amyn Amlani, President, Acad. of Drs. of Audiology, and Stephanie Czuhajewski, Exec. Dir., Acad. of Drs. of Audiology, to Rep. Ben Cline (Jan. 15, 2025), https://perma.cc/758Z-95JC. Because suppressors are one of the most effective hearing protection tools, police departments routinely purchase them to "[r]educ[e] potential hearing loss of officers and the public during shooting events." Joanna Putman, *Wash. PD Equips Entire*

*Department with Silencers from Silencer Central*, POLICE1 (May 15, 2024), https://perma.cc/MD4N-8S79. As the Law Enforcement Management Institute of Texas concluded, "[t]o help prevent permanent hearing loss to law enforcement officers, agencies should utilize firearm sound suppressors." JAMES B. ABBOTT, TEX. OFF. ATT'Y GEN., USE OF FIREARM SUPPRESSORS BY LAW ENFORCEMENT TO PREVENT HEARING LOSS 9 (2024), https://perma.cc/FF96-5Q9J. Likewise, "[i]n 2017 the U.S. Marines began using suppressors on service weapons" to reduce gunshot-related hearing loss. *Military-Grade Protection*, HEARING HEALTH FOUND., https://perma.cc/U369-7C2N.

57.    This widespread support makes sense. Without the use of suppressors, "[t]he level of impulse noise generated by almost all firearms exceeds the 140 dB peak [sound pressure level] limit recommended by [OSHA] and [NIOSH]." Michael Stewart et al., *Risks Faced by Recreational Firearm Users*, AUDIOLOGY TODAY, Mar.–Apr. 2011, at 38, 40, https://perma.cc/QS93-AVV8. Consequently, "it is not surprising that recreational firearm noise exposure is one of the leading causes of [noise induced hearing loss] in America today." *Id.* With a suppressor, however, the sound of a firearm can fall within safer levels. For example, the sound of a Smith & Wesson 9mm pistol with a suppressor can be as low as 127–130 decibels. David Kopel, *The Hearing Protection Act and 'Silencers'*, VOLOKH CONSPIRACY (June 19, 2017), https://perma.cc/C5FU-T6U8. An AR-15 rifle with a suppressor, meanwhile, makes a noise around 132 decibels. Glenn Kessler, *Are Firearms with a Silencer 'Quiet'?*, WASH. POST (Mar. 20, 2017), https://perma.cc/9M7S-NFYH.

58.    Second, suppressors are commonly used as a public courtesy to prevent noise pollution from lawful target shooting in neighborhoods and communities. Although suppressors

do not silence gunshots, they reduce the decibel level of gunshots. In fact, this was the reason suppressors were invented. MAXIM, at 2–4.

59.     Third, suppressors are commonly used to make firearm training safer and to improve the accuracy of firearms. Suppressors reduce recoil, allowing for greater control of a firearm and improved accuracy. *See Do Suppressors Reduce Recoil?*, SILENCER SHOP (Apr. 2, 2024), https://perma.cc/9H6M-A8LU. Further, using suppressors in conjunction with earmuffs or ear plugs (or in place of earmuffs or ear plugs, in instances where traditional hearing protection is not commonly used, such as self-defense or hunting) increases a firearm user's ability to hear commands and warnings, which improves the safe use of firearms at ranges and elsewhere. *See Firearm Sound Moderators*, at 34.

60.     Fourth, suppressors are commonly used to make self-defense and defense of the home safer and more effective. If an individual must use a firearm for self-defense, suppressors reduce recoil and shot flinch, improving the accuracy of a shot. The individual may not have earmuffs or ear plugs at his or her disposal. Accordingly, a suppressor already affixed to the barrel of the firearm allows the individual to exercise self-defense or defense of the home while dramatically reducing the risk of permanent hearing loss. Further, the individual retains the ability to effectively communicate with other household members and hear outside noises or signals, which may aid in coordinating self-defense activities or contacting law enforcement.

61.     The Government agrees that suppressors "have several benefits to persons in exercising their Second Amendment rights" and "facilitate the constitutional right to keep and bear arms," including "limit[ing] the noise caused by firearms," "improv[ing] accuracy and aid[ing] in target re-acquisition by reducing recoil and muzzle rise," and "aid[ing] in target shooting." Gov't *Peterson* Br. at 4–5.

22

62.   Although not relevant to the constitutional inquiry, by contrast, suppressors are almost never used for criminal purposes. "Overall numbers certainly suggest that silencers are a very minor law enforcement problem." Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 W. CRIM. REV. 44, 51 (2007). A leading study estimated the number of suppressor-related prosecutions to be just 30 to 40 cases per year out of a total of 75,000 to 80,000 federal criminal prosecutions, and a large majority of those cases did not involve "the actual use of a silencer in a crime." *Id.* at 52. Indeed, unsuppressed firearms "are far more likely to be actively employed, as well as used to injure a victim." *Id.* In 2017, ATF Associate Deputy Director Ronald B. Turk confirmed that suppressors "are very rarely used in criminal shootings." RONALD TURK, BUREAU OF ALCOHOL, TOBACCO, FIREARMS & EXPLOSIVES, OPTIONS TO REDUCE OR MODIFY FIREARMS REGULATIONS 6–7 (2017), https://perma.cc/H52G-BJCT.

63.   The fact that suppressors are very rarely used for criminal purposes makes sense, as suppressors are not of much use to criminals. After all, suppressed gunshots are by no means "silent." For example, the 127 decibels generated by a suppressed 9mm pistol are louder than an ambulance siren or a rock concert. BRIAN J. FLIGOR, BETTER HEARING INST., PREVENTION OF HEARING LOSS FROM NOISE 8 (2011), https://perma.cc/NAZ3-VL46. Accordingly, criminals who shoot suppressed weapons can still be easily heard. Suppressors can reduce or prevent hearing damage but do not silence criminal activity.

64.   The Government agrees that suppressors' "beneficial use is overwhelming in relation to their criminal use." Gov't *Peterson* Br. at 7.

65.   Although the transferring of suppressors has been regulated under the NFA's onerous licensing scheme since 1934, the legislative history of the NFA does not demonstrate that Congress viewed suppressors as a dangerous or unusual weapon. The inclusion of all suppressors

appears to be an accident. The original draft of the bill only regulated suppressors for firearms that were "capable of being concealed on the person." Stephen P. Halbrook, *The Power to Tax, the Second Amendment, and the Search for Which "'Gangster' Weapons" to Tax*, 25 WYO. L. REV. 149, 173 (2025) [hereinafter *The Power to Tax*]. This made sense because concealed weapons themselves were included in the draft bill at that point in the drafting process. *Id.* Yet, without explanation, a future draft of the NFA that *removed* traditional handguns from its scope nevertheless *expanded* the class of covered suppressors from those suited for concealable weapons to all suppressors. *Id.*

66.     The NFA's regulatory scheme as pertains to suppressors, therefore, is a regulation of keeping and bearing arms that are commonly possessed and used for lawful purposes, including hearing protection, public courtesy, firearm accuracy and training, and self-defense in the home.

**B.     Short-Barreled Rifles Are Second Amendment–Protected Arms.**

67.     Short-barreled rifles plainly are arms under the plain text of the Second Amendment. Their use can only be restricted, therefore, if they are both dangerous and unusual. *See Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 46–48; *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). Short-barreled rifles are not dangerous and unusual weapons. The Constitution therefore guarantees the right of peaceable citizens to possess and use them.

68.     First, for dangerousness, there is nothing about a short-barreled rifle that makes it any more dangerous than other protected arms. A short-barreled rifle is simply an intermediate-size firearm that is more accurate, although less portable, than a handgun. A short-barreled rifle is also more portable, although generally less accurate, than a rifle with a longer barrel. Nor is there anything inherently dangerous about short-barreled rifles, *i.e.*, rifles with barrels under 16 inches in length. *See The Power to Tax*, at 181; Joseph G.S. Greenlee, *The Tradition of Short-Barreled*

*Rifle Use & Regulation in America*, 25 WYO. L. REV. 111, 141 (2025) [hereinafter *The Tradition of Short-Barreled Rifle Use*].

69.     Again, although irrelevant to this Court's constitutional inquiry, statistical surveys demonstrate that short-barreled rifles are rarely used by criminals. *See The Tradition of Short-Barreled Rifle Use*, at 141. For example, a survey conducted by the National Institute for Justice found that only seven of the 157 firearm criminals that they interviewed had used a short-barreled rifle. JAMES D. WRIGHT & PETER H. ROSSI, ARMED AND CONSIDERED DANGEROUS 95 tbl. 4.6 (2d ed. 2008). That number is lower than pistols, short-barreled shotguns, regular shotguns, and regular rifles. *Id.*

70.     The legislative history of the NFA itself demonstrates that Congress did not even view short-barreled rifles as particularly dangerous. *See The Tradition of Short-Barreled Rifle Use*, at 130–36. The bill that became the NFA did not originally restrict possession of short-barreled rifles but, as explained above, the original draft did include concealable firearms. Without any mention of the barrel length of rifles in the statute, Representative Harold Knutson of Minnesota was concerned that the category of "any other firearm capable of being concealed on the person" could be interpreted to include some hunting rifles. *National Firearms Act Hearings*, 73d Cong., 2d Sess. 13 (statement of Rep. Harold Knutson). His constituents would not stand for a steep tax on popular hunting rifles. *Id.* Thus, Knutson suggested taxing short-barreled rifles in addition to short-barreled shotguns to effectively create a safe-harbor for rifles longer than the specified length. *See The Power to Tax*, at 169. The ban on short-barreled rifles was thus a historical accident and not a necessary measure to keep arms away from criminals. Indeed, "no one mentioned a short-barreled rifle having any criminal use" during the Senate hearings after the tax on short-barrel rifles was added to the bill. *Id.* at 170.

71.    Second, regarding unusualness, short-barreled rifles are in common use in the United States. As of May 2021, there were 532,725 short-barreled rifles registered with the ATF. *See* ATF STATISTICAL UPDATE 2021, at 16. As of May 2024, the ATF reported that number had increased to 870,286. *See* ATF STATISTICAL UPDATE 2024, at 12. As of October 14, 2025, there were 820,338 non-government registered short-barreled rifles (1,179,994 registered short-barreled rifles total).

72.    To be sure, the Supreme Court in 1939 rejected a Second Amendment challenge to the inclusion of short-barreled *shotguns* in the NFA because there was insufficient evidence to demonstrate that those firearms were protected arms. *See United States v. Miller*, 307 U.S. 174, 178 (1939). But *Miller* does not foreclose a Second Amendment challenge to the NFA's application to short-barreled *rifles*, as short-barreled rifles are distinct from short-barreled shotguns.

73.    There is no constitutionally relevant difference between what the government unconstitutionally regulates as "short-barreled rifles" and other rifles that all agree are protected arms. Just like other rifles, short-barreled rifles are popular and commonly possessed for lawful purposes such as self-defense, proficiency training, hunting, competition, and collecting, and they are lawful to possess and use in the vast majority of states now and historically.

74.    The NFA's regulatory scheme as pertains to short-barreled rifles, therefore, is a regulation of keeping and bearing arms that are neither dangerous nor unusual.

### C.    There is No Historical Tradition Supporting the NFA's Comprehensive Regulatory Scheme for Protected Arms.

75.    Because suppressors and short-barreled rifles are not dangerous and unusual weapons, they cannot be ahistorically regulated due to the Second Amendment's protections. And there is no historical tradition that would support the NFA's all-encompassing registration scheme for suppressors, short-barreled rifles, or any other protected arm.

76.     Defendants bear the burden of identifying a "well-established and representative historical analogue." *Bruen*, 597 U.S. at 30 (emphasis omitted). To determine whether the modern regulation and the historical analogue are "relevantly similar," the Court looks to the "how and why" of the two regulations. *Id.* at 29.

77.     Defendants will be unable to carry their burden because there is no historical tradition of requiring the registration of protected arms at all, much less punishing the failure to do so with hefty criminal penalties. *See The Tradition of Short-Barreled Rifle Use*, at 140–47.

78.     There can be little doubt that had King George III sought to require the colonists to register all of their firearms with the crown, it would have "provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms." *Heller*, 554 U.S. at 594. While the Supreme Court has posited that licensing regimes may be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks omitted), registration is wholly unnecessary for that purpose. Indeed, even if the NFA were held unconstitutional as applied to suppressors and short-barreled rifles, commercial suppressor and short-barreled rifle sales would still be subject to the background check requirements of the Gun Control Act. *See* 18 U.S.C. §§ 921(a)(3), 922(t). What registration does do is allow a government to track who has arms and, therefore, registration facilitates efforts by a government to disarm the populace. *See generally* STEPHEN P. HALBROOK, GUN CONTROL IN THE THIRD REICH: DISARMING THE JEWS AND "ENEMIES OF THE STATE" (2013). It is thus unsurprising that registration requirements "are often seen as half-a-loaf measures aimed at deterring gun ownership." *Heller v. District of Columbia*, 670 F.3d 1244, 1291 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

79.     Accordingly, because suppressors and short-barreled rifles are neither dangerous nor unusual, and there is no historical tradition of requiring the registration of protected arms, the NFA's registration scheme as pertains to suppressors and short-barreled rifles is unconstitutional under the Second Amendment.

## COUNT ONE
### Violation of the U.S. Constitution
### The NFA's Regulation of Untaxed Firearms Exceeds Congress's Authority

80.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count below as though set forth fully herein.

81.     The NFA's registration and related requirements on untaxed firearms exceed Congress's enumerated powers and are thus unconstitutional.

82.     Congress passed the NFA explicitly premised on, and the Supreme Court upheld the NFA as an exercise of, Congress's taxing power. *Sonzinsky*, 300 U.S. at 513–14.

83.     As a result of OBBB § 70436, nearly all of the firearms covered by the NFA—except for machineguns and "destructive devices"—are now untaxed, yet the comprehensive registration scheme to make, transfer, receive, or possess those firearms remains in effect.

84.     Individual Plaintiffs, Meridian Ordnance and its customers, and the members of Organizational Plaintiffs are injured by the NFA's unconstitutional requirements.

85.     Plaintiffs are entitled to a declaration that the NFA's requirements to make, transfer, receive, possess, or otherwise use firearms untaxed under the NFA, and any regulations implementing them, exceed Congress's enumerated powers and are thus unconstitutional, both facially and/or as applied to Individual Plaintiffs, Meridian Ordnance and its customers, and Organizational Plaintiffs' members. *See, e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861, 5871, 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

86.    Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing the NFA's registration requirements to make, transfer, receive, possess, or otherwise use firearms untaxed under the NFA and any regulations implementing those registration requirements. *See, e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861, 5871, 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

## COUNT TWO
### Violation of the U.S. Constitution
### The NFA's Regulation of Suppressors and Short-Barreled Rifles Violates
### the Second Amendment

87.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the count above as though set forth fully herein.

88.    The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

89.    "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (citations omitted); *see also Bruen*, 597 U.S. at 28 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.").

90.    The Supreme Court has stated the test for addressing Second Amendment challenges: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation

by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

91.     By regulating suppressors and short-barreled rifles, the NFA regulates the use of bearable arms in common use by Americans for lawful purposes. Suppressors and short-barreled rifles are neither dangerous nor unusual and their possession is protected by the Second Amendment. There is no historical tradition that would justify the NFA's comprehensive registration scheme for protected arms.

92.     Defendants therefore violate the Second Amendment right to keep and bear arms by forcing law-abiding Americans, including Individual Plaintiffs, Meridian Ordnance and its customers, and members of Organizational Plaintiffs, under pain of felony violation, to comply with the challenged provisions of the NFA to make, transfer, receive, possess, or otherwise use suppressors and short-barreled rifles.

93.     Defendants' enforcement of the NFA forces Individual Plaintiffs, Meridian Ordnance and its customers, and Organizational Plaintiffs' members either to comply with the unconstitutional registration scheme—thereby being burdened in exercising their rights under the Second Amendment to the United States Constitution—or be subjected to criminal prosecution.

94.     Therefore, as a direct and proximate result of the above infringement and impermissible burden on Second Amendment rights, Individual Plaintiffs, Meridian Ordnance and its customers, and Organizational Plaintiffs' members have suffered—and continue to suffer—from an unlawful and irreparable deprivation of the fundamental constitutional right to keep and bear arms.

95.     Plaintiffs are entitled to a declaration that the NFA's requirements with respect to the making, transferring, receiving, possessing, or otherwise using suppressors and short-barreled

rifles, along with the regulations that implement them, violate the Second Amendment and are thus unconstitutional both facially and/or as applied to Individual Plaintiffs, Meridian Ordnance and its customers, and Organizational Plaintiffs' members. *See, e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861, 5871, 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

96.     Plaintiffs are entitled to a permanent injunction against Defendants from implementing or otherwise enforcing any part of the NFA and related regulations that pertain to untaxed suppressors and short-barreled rifles. *See, e.g.*, 26 U.S.C. §§ 5811, 5812, 5821, 5822, 5841, 5861, 5871, 5872(a); 18 U.S.C. § 3571; 27 C.F.R. §§ 479.62, 479.84.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief from this Court:

a.     Declare that the NFA's requirements relating to making, transferring, receiving, possessing, or otherwise using untaxed firearms exceed Congress's enumerated powers, both facially and as-applied;

b.     Declare that any regulations promulgated, in whole or in part, under such requirements are unlawful;

c.     Declare that such requirements and any regulations implementing them violate the Second Amendment with respect to suppressors and short-barreled rifles, both facially and as-applied;

d.     Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of the NFA with respect to violations in any way predicated on failure to comply with the NFA's unconstitutional provisions pertaining to making, transferring, receiving, possessing, or using untaxed firearms or, in the alternative, untaxed suppressors and short-barreled rifles;

e.     Enjoin Defendants and their employees, agents, successors, or any other person acting in concert with them, from implementing, enforcing, or otherwise acting under the authority of all regulations promulgated to

31

effectuate the challenged NFA requirements, including, but not limited to, 27 C.F.R. §§ 479.62 and 479.84;

f.      Award Plaintiffs the costs of this action and reasonable attorneys' fees; and

g.      Award Plaintiffs such other legal and equitable relief as is just and appropriate and as necessary to effectuate the Court's judgment.

Dated: February 26, 2026                    Respectfully Submitted,

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
Nicholas A. Varone*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
nvarone@cooperkirk.com

*Applications for *pro hac vice* admission forthcoming

*Attorneys for Plaintiffs*