# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
COVINGTON DIVISION

T.J. ROBERTS, et al.

           *Plaintiffs*,

    v.

BUREAU OF ALCOHOL, TOBACCO,
FIREARMS AND EXPLOSIVES, et al.

           *Defendants*.

Case No. 2:26-cv-00091-SCM

## BRIEF OF CITY OF BALTIMORE, MARYLAND; CITY OF COLUMBUS, OHIO; AND HARRIS COUNTY, TEXAS, AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ i

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................. 1

    I.    The National Firearms Act Protects Municipalities'
    Interests by Making Cities Safer ................................................................... 1

    II.    The Challenged Provisions Are a Lawful Exercise of
    Congress's Enumerated Powers .................................................................... 5

        A.    The National Firearms Act Is A Valid Exercise of
        Congress's Powers to Raise Revenue ................................................ 5

        B.    The NFA Is a Valid Exercise of Congress's Commerce
        Clause Power ..................................................................................... 10

        C.    The 2025 Amendments to the National Firearms Act
        Are Severable .................................................................................... 13

    III.    The Challenged Provisions Are Consistent with the Second
    Amendment ................................................................................................... 16

        A.    The NFA Registration Provisions Are a Presumptively
        Lawful Shall-Issue Licensing Regime .............................................. 16

        B.    Silencers Are Not "Arms" Within the Meaning of the
        Second Amendment ........................................................................... 18

        C.    The Challenged Provisions Are Consistent with Our
        Nation's Historical Restrictions on Dangerous and
        Unusual Weapons .............................................................................. 19

        D.    The Challenged Provisions Are Relevantly Similar to
        Additional Historical Regulations ..................................................... 23

CONCLUSION ....................................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Barr v. Am.. Ass'n of Pol. Consultants, Inc.,*
    591 U.S. 610 (2020)..................................................................................... 14

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ................................................................... 22

*Bianchi v. Brown,*
    111 F.4th 438 (4th Cir. 2024) ................................................................... 22

*Cal. v. Texas,*
    593 U.S. 659 (2021)..................................................................................... 8

*Demko v. United States,*
    216 F.3d 1049 (Fed. Cir. 2000)................................................................... 1

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)............................................................................ *passim*

*Duncan v. Bonta,*
    133 F.4th 852 (9th Cir. 2025) (en banc),
    *petition for cert. docketed,* No. 25-198 (Aug. 19, 2025). ................... 18, 19

*Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Savs. Bank,*
    527 U.S. 627 (1999)................................................................................... 11

*Frost v. Corp. Comm'n of Okla.,*
    278 U.S. 515 (1929)................................................................................... 14

*Gonzales v. Raich,*
    545 U.S. 1 (2005)......................................................................... 11, 12, 13

*Johnson v. United States,*
    576 U.S. 591 (2015)................................................................................... 22

*Lindenbaum v. Realgy, LLC*
    13 F.4th 524 (6th Cir. 2021) ..................................................................... 14

*Marks v. United States,*
    430 U.S. 188 (1977)................................................................................... 14

*McRorey v. Garland,*
    99 F.4th 831 (5th Cir. 2024)...............................................................................17

*Med. Ctr. Pharmacy v. Mukasey,*
    536 F.3d 383 (5th Cir. 2008) ...............................................................................14

*Mock v. Garland,*
    75 F.4th 563 (5th Cir. 2023) ...................................................................................2

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012)...........................................................................................9, 10

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022)............................................................................................*passim*

*Ream v. U.S. Dep't of Treasury,*
    --- F.4th ---, 2026 WL 1078212 (6th Cir. Apr. 21, 2026).......................................6

*Seila L. LLC v. CFPB,*
    591 U.S. 197 (2020)..........................................................................................14, 15

*Sonzinsky v. United States,*
    300 U.S. 506 (1937)........................................................................................5, 8, 9

*Taylor v. United States,*
    579 U.S. 301 (2016).............................................................................................13

*Teixeira v. Cnty. Alameda,*
    873 F.3d 670 (9th Cir. 2017) ...............................................................................24

*Texas v. United States,*
    945 F.3d 355 (5th Cir. 2019) .................................................................................8

*Truax v. Corrigan,*
    257 U.S. 312 (1921)..............................................................................................14

*United States v. Ardoin,*
    19 F.3d 177 (5th Cir. 1994) ...............................................................................7, 8

*United States v. Berger,*
    715 F. Supp. 3d 676 (E.D. Pa. 2024) ..................................................................19

*United States v. Bradley,*
    766 F. Supp. 3d 769 (S.D. Ohio 2025) ...............................................................19

*United States v. Brooks,*
No. 24-5334, 2025 WL 2939404 (6th Cir. Oct. 16, 2025) ................................... 20, 21, 22

*United States v. Bridges,*
150 F.4th 517 (6th Cir. 2025) ............................................................... 19, 20, 21

*United States v. Bowers,*
594 F.3d 522 (6th Cir. 2010) .......................................................................... 13

*United States v. Cox,*
906 F.3d 1170 (10th Cir. 2018) ................................................................. 19, 22

*United States v. Dodge,*
61 F.3d 142 (2d Cir. 1995).............................................................................. 7

*United States v. Fortes,*
141 F.3d 1 (1st Cir. 1998)............................................................................. 23

*United States v. Holton,*
639 F. Supp. 3d 704 (N.D. Tex. 2022) ...................................................... 23, 24

*United States v. Jackson,*
390 U.S. 570 (1968)..................................................................................... 15

*United States v. Jones,*
976 F.2d 176 (4th Cir. 1992) .......................................................................... 7

*United States v. Miller,*
307 U.S. 174 (1939)................................................................................ 21, 23

*United States v. Morrison,*
529 U.S. 598 (2000)..................................................................................... 12

*United States v. Peterson,*
161 F.4th 331(5th Cir. 2025) ................................................................. 2, 17, 18

*United States v. Rahimi,*
602 U.S. 680 (2024)............................................................................. 3, 19, 20

*United States v. Robinson,*
No. 12-12551, 2025 WL 870981 (11th Cir. 2025) ............................................ 20

*United States v. Rose,*
522 F.3d 710 (6th Cir. 2008) .................................................................... 11, 13

*United States v. Rush,*
   130 F.4th 633 (7th Cir. 2025) .................................................................................. *passim*

*United States v. Saleem,*
   No. 23-4693, 2024 WL 5084523 (4th Cir. Dec. 12, 2024)................................................. 20

*United States v. Speed,*
   175 F.4th 272 (4th Cir. 2026) .................................................................................. 17, 18

*United States v. Thompson/Ctr. Arms Co.,*
   504 U.S. 505 (1992)................................................................................................ 1, 22, 25

*United States v. Tribunella,*
   749 F.2d 104 (2d Cir. 1984)........................................................................................... 2

*United States v. Warin,*
   530 F.2d 103 (6th Cir. 1976) ......................................................................................... 10

*Woods v Cloyd W. Miller Co.,*
   333 U.S. 138 (1948)........................................................................................................ 10

**STATUTES**

26 U.S.C. § 4182................................................................................................................... 9

26 U.S.C. § 5000A(c) ......................................................................................................... 10

26 U.S.C. § 5801.................................................................................................................. 6

26 U.S.C. § 5802.................................................................................................................. 12

26 U.S.C. § 5812.................................................................................................................. 2, 3, 12

26 U.S.C. § 5821.................................................................................................................. 2

26 U.S.C. § 5822.................................................................................................................. 2, 12, 17

26 U.S.C. § 5841(b) ........................................................................................................... 13

26 U.S.C. § 5845.................................................................................................................. 2, 6, 7

26 U.S.C. § 5852.................................................................................................................. 8

26 U.S.C. § 5853.................................................................................................................. 8

26 U.S.C. § 6012.................................................................................................................. 8

26 U.S.C. § 6033 ............................................................................................................ 8

26 U.S.C. § 7801(a)(2) .................................................................................................. 2

26 U.S.C. § 7852(a) ..................................................................................................... 14

26 U.S.C. subtit. E, ch. 53, subchapter A note .......................................................... 11

**CONSTITUTIONAL PROVISIONS**

Coronavirus Aid, Relief, and Economic Security Act (CARES) Act,
   Pub. L. No. 116-136, § 4007, 134 Stat. 281 (2020) ............................................ 9

Gun Control Act,
   Pub. L. No. 90-618, tit. II, 82 Stat. 1213 (1968) ............................................... 11

One Big Beautiful Bill Act,
   Pub. L. No. 119-21, § 70436, 139 Stat. 72 (2025) ..................................... 5, 6 14

U.S. Const. amend II. .................................................................................................. 16

Virginia Act of Feb. 27, 1631, Act LVI ..................................................................... 23

**REGULATIONS**

27 C.F.R. § 479.62 ..................................................................................................... 2,3

27 C.F.R. § 479.64 ....................................................................................................... 2

27 C.F.R. § 479.65 ....................................................................................................... 2

27 C.F.R. § 479.84 ....................................................................................................... 3

27 C.F.R. § 479.86 ....................................................................................................... 2

Machineguns, Destructive Devices, and Certain Other Firearms,
   81 Fed. Reg. 2658 (Jan. 15, 2016) .................................................................. 3, 4

Removing CLEO Notification Under The National Firearms Act,
   91 Fed. Reg. 24471 (May 6, 2026) ...................................................................... 3

**OTHER AUTHORITIES**

H.R. Rep. No. 90-1956 (1968) ................................................................................... 11

Hearings Before the H. Comm. on Ways and Means on H.R. 9066,
73d Cong., 2d Sess. 6 (1934) ...................................................................... 11

Mecklenburg County:  A List of Men under Captain Alexander, North Carolina
Digital Collections, https://perma.cc/JUM2-ZL7N ........................................ 24

Press Release, Off. Of the State's Att'y for Balt. City, *Multi- Jurisdictional Law
Enforcement Collaborative Dismantles Four Criminal Organizations Operating
Throughout Southwestern Baltimore* (Nov. 25, 2024), https://perma.cc/s6RH-ACTP ................... 4

*Return of Arms and Accoutrements in Jeremiah Olney's Company, June 10, 1776,
The Rhode Island Historical Society*, https://perma.cc/TT6U-5UFB ............................. 24

Robert Spitzer, *Gun Law History in the United States and the Second Amendment, 80
Law & Contemp. Probs. 55, 76–77 (2017)* ............................................... 24

S. Rep. No. 90-1501 (1968) .............................................................. 1, 2, 11, 13

Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of
Gun Control in America* 27-28 (2006) ..................................................... 23

Senate Finance Comm., *Legislative Text Title VII* (n.d.),
https://perma.cc/MVA6-RPU4 .............................................................. 15

SoundThinking, Inc., *ShotSpotter* FAQ (June 2019), https://perma.cc/2W6V-79XD .................... 4

SoundThinking, Inc., *ShotSpotter® Saves Lives and Find Critical Evidence with The
Leading Gunshot Detection System* (last visited June 1, 2026),,
https://perma.cc/9Y53-J9GN .............................................................. 4

2 Public Papers of George Clinton 828 (Wynkoop Hallenbevk Crawford Co. ed.,
1900) ................................................................................... 18, 19

4 William Blackstone, *Commentaries on the Laws of England* 148–49 (1769) ..................... 25

## INTRODUCTION

Through this suit, Plaintiffs seek to invalidate a nearly 90-year-old federal statute regulating certain especially dangerous firearms. The National Firearms Act (NFA or the Act) imposes taxation and registration requirements on machine guns, short-barreled shotguns, short-barreled rifles, silencers, "destructive devices," and certain other weapons that Congress has deemed particularly susceptible to criminal misuse. These requirements help ensure that such weapons are not made or possessed by individuals who might use them in ways that pose acute threats to public safety.

The law's public-safety function is particularly important to municipalities, which often play a leading role in deterring, investigating, and prosecuting violent crime. Congress explained that one of the law's principal purposes is "to assist law enforcement authorities in the States and their subdivisions in combating" gun crimes. S. Rep. No. 90-1501, at 22 (1968). Amici curiae—the City of Baltimore, Maryland; the City of Columbus, Ohio; and Harris County, Texas—therefore have an important interest in seeing that the Act is upheld against Plaintiffs' meritless constitutional challenges. Amici respectfully submit this brief to explain the ways in which the NFA promotes their public-safety and law-enforcement interests and to underscore the deficiencies in Plaintiffs' legal theories. Amici urge the Court to deny Plaintiffs' motion for summary judgment, grant Defendants' cross-motion for summary judgment, and uphold the NFA's constitutionality.

## ARGUMENT

I.    **The National Firearms Act Protects Municipalities' Interests by Making Cities Safer**

The NFA imposes regulatory requirements on individuals who want to manufacture, import, make, or transfer certain especially dangerous firearms. These provisions were adopted to regulate "weapons likely to be used for criminal purposes." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *see also Demko v. United States*, 216 F.3d 1049,

1

1052–53 (Fed. Cir. 2000) (the NFA was adopted "to achieve greater control and regulation of weapons that can be used in violent crimes" (quoting *United States v. Tribunella*, 749 F.2d 104, 109 (2d Cir. 1984))). As relevant here, NFA-regulated weapons include short-barreled rifles, short-barreled shotguns, and silencers. *See* 26 U.S.C. § 5845(a); *see also Mock v. Garland*, 75 F.4th 563, 570 (5th Cir. 2023) (discussing Congress's concern with easily concealed weapons).

These provisions help promote municipalities' public-safety and law-enforcement functions. When Congress revised and reenacted the Act in 1968, it explained that one of the law's purposes is "to assist law enforcement authorities in the States and their subdivisions in combating" violent crime. S. Rep. No. 90-1501, at 22. It achieves that goal through several mechanisms.

First, the NFA helps keep dangerous weapons out of the hands of those who would misuse them for unlawful purposes. A person intending to make or transfer an NFA-regulated firearm must file an application with the U.S. Department of Justice's Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) prior to making or transferring the weapon. 26 U.S.C. §§ 5812(a), 5822; *see also* 27 C.F.R. §§ 479.62, 479.64, 479.84, 479.86.[1] If the applicant is an individual, the application must include the applicant's fingerprints and photograph. 26 U.S.C. §§ 5812(a), 5822. ATF will deny an application to make or transfer a firearm if the making, transfer, receipt, or possession of the firearm would place the relevant individual in violation of federal, state, or local law. 26 U.S.C. §§ 5812(a), 5822; 27 C.F.R. § 479.65. The NFA's application procedure thus prevents individuals who are legally barred from firearms ownership because of the danger that they pose from making or acquiring NFA-regulated weapons. *See, e.g., United States v. Peterson*, 161 F.4th 331, 339 (5th Cir. 2025), *cert. denied*, ___ S. Ct. ___ (2026) (finding "no reason to doubt" that the NFA's application procedures are "'designed to ensure only that those bearing arms in the

---

[1] The statutory text refers to the Secretary of the Treasury, but the relevant functions have been transferred to the Department of Justice. *See* 26 U.S.C. § 7801(a)(2).

2

jurisdiction are, in fact, law-abiding, responsible citizens.'" (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022) (some quotation marks omitted)). That important function both fits comfortably in a long historical tradition of firearms regulations and helps protect municipalities and their citizens from gun violence. *See, e.g.*, *United States v. Rahimi*, 602 U.S. 680, 690 (2024) ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms.").

The NFA's current implementing regulations also require applicants to forward a copy of the application to the "chief law enforcement officer [(CLEO)] of the locality in which the applicant or responsible person is located" before the application may be submitted to ATF. 27 C.F.R. § 479.62(c) (application to make); *id.* § 479.84(c) (application to transfer).[2] The notification requirements serve important law enforcement purposes. As ATF has explained, the notification provides local law enforcement with "awareness that a resident of the [officer's] jurisdiction has applied to make or obtain a [specified] weapon and affords the CLEO an opportunity to provide input to the ATF of any information that may not be available during a Federal background check indicating the applicant is prohibited from possessing firearms." Machineguns, Destructive Devices, and Certain Other Firearms, 81 Fed. Reg. 2658, 2682 (Jan. 15, 2016). Although the National Instant Criminal Background Check Systems (NICS) "provides access to a substantial number of records to verify if an individual is prohibited from possessing firearms, CLEOs often have access to records or information that has not been made available to NICS." *Id.* Providing notice of a "prospective NFA transfer with instructions on how to relay relevant information to ATF will help fill possible information gaps in NICS by affording the CLEO a reasonable

---

[2] ATF has published a notice of proposed rulemaking that, if finalized as proposed, would remove the CLEO notification requirement. Removing CLEO Notification Under the National Firearms Act, 91 Fed. Reg. 24471 (May 6, 2026).

3

opportunity to provide relevant information to ATF." *Id.* Municipalities thus play a role in ensuring that NFA-regulated weapons are not possessed by persons legally prohibited from having them.

The NFA's registration records also promote the safety of municipal police officers. Municipal police departments conduct join investigations and raids with federal ATF officials. *See, e.g.*, Press Release, Off. of the State's Att'y for Balt. City, *Multi-Jurisdictional Law Enforcement Collaborative Dismantles Four Criminal Organizations Operating Throughout Southwestern Baltimore* (Nov. 25, 2024), https://perma.cc/S6RH-ACTP (noting that ATF and Baltimore City Police cooperated in investigating the charged drug trafficking and firearms offenses). Before conducting a raid, ATF can search a database containing NFA registration information, known as the National Firearms Registration and Transfer Record, to determine if individuals involved possess any dangerous NFA-regulated firearms. ATF can use that information to inform its operational plans and ensure officer safety. To the extent that ATF does so, its local law-enforcement partners engaging in those joint raids also benefit from operational plans that incorporate important security precautions.

Municipalities also have particular interests in limiting the proliferation of NFA-regulated silencers, which can make gun crimes more difficult to detect and investigate. The Baltimore City Police Department, for example, currently uses ShotSpotter technology, which alerts police when a gun is fired so that they can be quickly dispatched to the scene. *See* SoundThinking, Inc., *ShotSpotter® Saves Lives and Find Critical Evidence with The Leading Gunshot Detection System* (last visited June 1, 2026), https://perma.cc/9Y53-J9GN. But the use of silencers makes it more difficult for ShotSpotter to accurately detect gunshots and alert police departments. *See, e.g.*, SoundThinking, Inc., *ShotSpotter FAQ* (June 2019), https://perma.cc/2W6V-79XD ("'Silencers' . . . suppress the impulsive sound of gunfire . . . . The ShotSpotter sensors are

4

designed to pick up the sound of [suppressed gunfire], but it does make it more challenging."). If the NFA's regulations of silencers tewere invalidated, it is highly likely that more silencers would be made, acquired, and used in crimes nationwide. Indeed, plaintiffs in this case have said that, absent the NFA's requirements, they would acquire additional silencers. Compl. at ¶¶ 18-19, 23. Dkt. No. 16. The increase in use of silencers predictably will make Baltimore's and other cities' investments in ShotSpotter technology less effective in deterring and investigating crimes.

For these reasons, amici have strong interests in seeing that the NFA's constitutionality is reaffirmed. Defendants' memorandum in support of their cross-motion for summary judgment, Dkt. No. 22, sets forth the reasons why the Act is a valid exercise of Congress's Article I authority and does not violate the Second Amendment. Amici concur in Defendants' arguments, and offer the following additional points that underscore why Defendants' position is correct.

## II.    The Challenged Provisions Are a Lawful Exercise of Congress's Enumerated Powers

The Court should uphold the NFA as a valid exercise of Congress's enumerated powers. The Supreme Court has previously upheld the Act based on Congress's taxing authority, *Sonzinsky v. United States*, 300 U.S. 506 (1937), and as Defendants have explained, Def. Mem. at 10–14, Dkt. No. 22, nothing in recent changes to the NFA's tax rates alters that conclusion. Alternatively, the Commerce Clause provides ample authority to uphold the law.

### A.    The National Firearms Act Is A Valid Exercise of Congress's Powers to Raise Revenue

Plaintiffs hinge their principal argument on the fact that last year, Congress set the tax rates for making and transferring certain NFA-regulated firearms to $0 effective January 1, 2026. *See* Pub. L. No. 119-21, § 70436(d), 139 Stat. 72, 248 (2025). That amendment does not affect the constitutionality of the statute for two main reasons. First, the challenged provisions requiring the registration of firearms continue to aid the collection of revenue because they are rationally related

5

to other taxes that Congress maintained at their preexisting levels. Second, even for those taxes now set to $0, Congress permissibly maintained the Act's tax architecture.

**1.** The registration provisions continue to serve revenue purposes. Notably, Congress maintained the special (occupational) taxes on importers, manufacturers, and dealers of firearms. *See* 26 U.S.C. § 5801 (generally setting the tax rate at $1,000 or $500 for each place of business). Because Congress kept short-barreled rifles, short-barreled shotguns, and silencers within the NFA's definition of "firearm," *id.* § 5845(a), entities that import, manufacture, or deal in those items remain subject to the occupational tax, *id.* § 5845(k)–(m). Plaintiffs do not dispute the continued validity of those taxes.

The statutory requirements Plaintiffs do challenge (requiring the registration and marking of firearms, *see* Mem. ISO Pls.' Mot. Summ. J. at 5-6.Dkt. No. 18) continue to operate as measures that Congress deemed necessary and proper to serve the occupational tax. Requiring the registration of firearms when they are made and transferred ensures that they can be linked to any importer, manufacturer, or dealer required to register and pay the occupational tax. *Cf. Ream v. U.S. Dep't of Treasury*, --- F.4th ---, 2026 WL 1078212, at *5 (6th Cir. Apr. 21, 2026) (upholding a ban on home distilling because it "shifts consumption from untaxed spirits to taxed spirits— thereby increasing revenue"). Indeed, those registration requirements remain vitally important, as the transfer records could help demonstrate, for example, that a person qualifies as a firearms "dealer" by being "engaged in the business of selling, renting, leasing, or loaning firearms," 26 U.S.C. § 5845(k); *see* Dkt. No. 22-4, at 6–7 (Albro Decl. ¶ 28). The fact that any particular transaction has a $0 tax is irrelevant.

Ongoing registration requirements serve revenue purposes in another way, too. The 2025 amendments made only prospective changes to the making and transfer tax rates. *See* Pub. L.

6

No. 119-21, § 70436(d), 139 Stat. at 248. As a result, makers and transferors of short-barreled rifles, short-barreled shotguns, and silencers still must pay the prior rate of $200 on those items made or transferred prior to the amendments' effective date. To prevent evasion of those taxes, Congress rationally could have determined that it was necessary and proper to maintain registration records documenting the chain of sales. *Cf. United States v. Dodge*, 61 F.3d 142, 146 (2d Cir. 1995) ("The registration of the transfer of firearms when there is no tax immediately due assists the government in the collection of taxes by creating a record to track the firearms. . . .").

**2.** The challenged provisions also "can be upheld on the preserved, but unused, power to tax." *United States v. Ardoin*, 19 F.3d 177, 180 (5th Cir. 1994). The Fifth Circuit's decision in *Ardoin* is instructive. There, Congress had imposed a tax on "machineguns" under the NFA but later outlawed possession of those weapons altogether. *Id.* at 179. As a result, the tax ceased raising revenue; the ATF did not even "allow tax payments or registration." *Id.* at 180. But the Fifth Circuit rejected the idea that the NFA was rendered unconstitutional as beyond the taxing power. It reasoned that the constitutional basis to "regulate—the taxing power—still exist[ed]; it [was] merely not exercised." *Id.*; *see also United States v. Jones*, 976 F.2d 176, 183-84 (4th Cir. 1992).

The same result obtains here. Congress has retained the tax architecture of the NFA with respect to the making and transfer of short-barreled rifles, short-barreled shotguns, and silencers. By lowering the rate to $0, it chose to confer a new tax benefit on the makers and transferors of certain firearms. Plaintiffs benefit from that change because they will no longer have to pay the $200 tax each time they make or transfer those firearms. But Congress did not abolish the taxation

7

and registration provisions altogether. Congress rationally could have selected that mechanism for many reasons, including allowing a future Congress to reinstate a tax easily, should it so choose.

Rather than discussing that on-point authority, Plaintiffs rely on *Texas v. United States*, 945 F.3d 355 (5th Cir. 2019), which had invalidated the Affordable Care Act's tax penalty for not maintaining health insurance after Congress set the amount of that tax penalty to $0. That decision was reversed by the Supreme Court because the plaintiffs lacked standing. *Cal. v. Texas*, 593 U.S. 659 (2021). Because the Supreme Court reversed the Fifth Circuit's judgment for lack of jurisdiction, the *Texas* opinion is not binding precedent even in the Fifth Circuit. And that opinion's discussion of the taxing power is not persuasive.

*Texas* sought to distinguish between the tax upheld in *Ardoin*, which it characterized as "non-revenue producing only in practice," and one that was "$0.00 as written on the books." *Texas v. United States*, 945 F.3d at 391. That distinction is without foundation. The tax code is littered with provisions that impose no tax burden. For example, taxpayers may be required to file a tax return even if their tax liability is $0. *See, e.g.*, 26 U.S.C. § 6012 (requiring returns from some individual taxpayers with no tax liability); *id.* § 6033 (requiring tax-exempt organizations to file annual returns). Or Congress may offer taxpayers an exemption from certain taxes, provided that they can offer the appropriate documentation. Indeed, several parts of the NFA do just that, *see id.* § 5852 (exemption for firearms made for or transferred to the United States government); *id.* § 5853 (similar exemption for other governmental entities). Those legislative choices are not unconstitutional merely because the tax rate is statutorily set at $0 for certain transactions or persons. After all, "[i]n the exercise of its constitutional power to lay taxes, Congress may select the subjects of taxation, choosing some and omitting others." *Sonzinsky*, 300 U.S. at 512.

8

In substance, setting the tax rate at $0 for a category of transactions—making and transferring certain firearms—is no different than offering an exemption from the tax for items falling within that category. *See Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 565 (2012) (focusing on "substance" over "designation" in assessing a tax statute's constitutionality). That is evident even from the language Congress chose, as it "deemed" the relevant tax "paid" in another section of the NFA. 26 U.S.C. § 4182. There are various other linguistic formulations Congress might have used to obtain that same result, such as by offering an offsetting tax credit or exemption. The fact that it chose to express its intent by setting a statutory rate of "$0" should not result in the statute's unconstitutionality.

Another oddity of this line of argument is that the constitutionality of various statutes would blink on or off depending on how Congress set tax rates. Congress sometimes grants temporary relief from a tax to stimulate an economic sector. *See, e.g.*, Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. No. 116-136, § 4007, 134 Stat. 281, 477 (2020). It makes little sense that any attendant recordkeeping requirements would become unconstitutional during the tax holiday. And Congress may have good reasons for maintaining associated recordkeeping or regulatory provisions "in aid of a revenue purpose." *Sonzinsky*, 300 U.S. at 513. For example, it would be critical to keep track of when various transactions occurred so the government can determine whether they fell within the tax holiday. That logic applies here. The government will still need to use the NFA's recordkeeping procedures to determine whether taxes are owed for transactions occurring during the period when the tax was $200. And, although Congress recently set certain NFA taxes to $0, nothing prevents Congress from increasing those rates just as quickly as it lowered them. Were that to happen, it appears that, under Plaintiffs' legal theory, the challenged provisions would spring back to life. Different Congresses may have

9

different views on how much firearms should be taxed, but the constitutional status of the entire law should not flicker when Congress adjusts the rates.

Ultimately, even if *Texas* were persuasive on its own facts, it is distinguishable here. The amendments at issue in that statute set the tax penalty—effectively, the tax rate—at $0 for all taxpayers. *See* 26 U.S.C. § 5000A(c). As a result, it appeared impossible for that tax to raise any revenue whatsoever. By contrast, even after recent amendments, the NFA continues to generate revenue through the special occupational tax. As explained above, the challenged provisions serve that revenue function. That provides ample basis for upholding the Act under the taxing power.

## B.    The NFA Is a Valid Exercise of Congress's Commerce Clause Power

Even if the challenged portions of the NFA were not within Congress's taxing power, they could be sustained as an exercise of Congress's power to regulate interstate commerce. The Sixth Circuit has indicated as much. *See United States v. Warin*, 530 F.2d 103, 107 (6th Cir. 1976), *abrogated on other grounds by District of Columbia v. Heller*, 554 U.S. 570 (2008) (explaining that the NFA, as amended, is "within both the taxing power and the commerce power of Congress" (cleaned up)). That conclusion is correct under recent Supreme Court decisions regarding the extent of Congress's authority to regulate interstate commerce.

**1.** As an initial matter, the Interstate Commerce Clause is properly considered as a basis to uphold the NFA. Ultimately, "[t]he 'question of the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.'" *NFIB*, 567 U.S. at 570 (quoting *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948)).[3] Particularly

---

[3] Plaintiffs' citations to *Florida Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav.s Bank*, 527 U.S. 627 (1999), do not support a contrary rule. At most, *Florida Prepaid* suggests that where Congress "explicit[ly]" invokes one constitutional power, and "[t]here is no suggestion" that another also could apply, that a court need not stretch to consider others not invoked. *Id.* at 642 n.7. There is no indication that the Supreme Court intended to *sub silentio* overturn the rule embodied in *Woods* that was later reaffirmed in *NFIB*.

10

because Congress need not make particular findings to legislate under the Commerce Clause, *Gonzales v. Raich*, 545 U.S. 1, 21 (2005), it is not necessary to consider whether Congress expressly invoked its authority over interstate commerce in the legislative history of the NFA.

In any event, Plaintiffs incorrectly presume that Congress disclaimed the use of its commerce power when it originally enacted the NFA. To the contrary, the legislative record shows that Congress viewed the measure as an exercise of both its taxing power and its commerce power. *See, e.g.*, Hearings Before the H. Comm. on Ways and Means on H.R. 9066, 73d Cong., 2d Sess. 6 (1934) (statement of Attorney General Cummings) ("Now we proceed in this bill generally under two powers—one, the taxing power, and the other, the power to regulate interstate commerce.").

Moreover, Congress reenacted and revised the National Firearms Act as part of the Gun Control Act of 1968. *See* Pub. L. No. 90-618, tit. II, 82 Stat. 1213, 1227–36 (1968); *see also* 26 U.S.C. subtit. E, ch. 53, subch. A note (memorializing "the general revision" of the statute in 1968). In the Gun Control Act, Congress explicitly invoked Congress's power to regulate interstate commerce. *See* 82 Stat. at 1213 (describing the law as "an act . . . to provide for better control of the interstate traffic in firearms" (capitalization altered)). As the Sixth Circuit has explained, the "legislative history" of the Gun Control Act further "supports the logical connection between the intrastate sale and disposition of firearms and the interstate market in firearms." *United States v. Rose*, 522 F.3d 710, 719 (6th Cir. 2008). Because "existing Federal controls over interstate and foreign commerce in firearms [were] not sufficient," the Gun Control Act's amendments were intended to provide "adequate Federal controls over interstate and foreign commerce in firearms." S. Rep. No. 90-1501, at 22; *see also* H.R. Rep. No. 90-1956, at 34–35 (1968) (Conf. Rep.).

Whatever constitutional powers Congress might have relied on in 1934, in the 1968 amendments Congress could hardly have been clearer that its express purpose was in fact to

11

regulate interstate commerce. Plaintiffs therefore offer no valid basis for disregarding the Commerce Clause as a basis on which to sustain the NFA's constitutionality.

2. The Commerce Clause empowered Congress to enact the challenged provisions of the National Firearms Act. As the Supreme Court has explained, its precedents "firmly establish[] Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Raich*, 545 U.S. at 17. Amici wish to emphasize the correctness of Defendants' arguments on this score. *See* Dkt. 22 at 14–29.

The NFA appropriately and directly regulates "some sort of economic endeavor." *United States v. Morrison*, 529 U.S. 598, 611 (2000). The challenged registration requirements operate on those who make, buy, sell, or otherwise transfer items that fall within the law's ambit. *See, e.g.*, 26 U.S.C. §§ 5802, 5812, 5822, 5841(b). Making, buying, and selling goods are "quintessentially economic" activities. *Raich*, 545 U.S. at 25–26 (upholding a statute "that regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market"); *see also Rose*, 522 F.3d at 717–18.

Plaintiffs identify some situations in which a person could make or transfer a firearm without money changing hands. *See* Dkt. No. 18, at 22. But these observations do not advance their case. Indeed, Plaintiffs' position simply mirrors the arguments rejected in *Raich*, where one of the plaintiffs "cultivate[d] her own marijuana" rather than buying it. 545 U.S. at 7. Growing marijuana for home use did not involve buying or selling goods, but the Supreme Court explained that Congress could regulate it under the Commerce Clause because it was part of a "class of activity [that] would undercut the regulation of the interstate market." *Id.* at 18. And because "the Commerce Clause gives Congress authority to regulate the national market," Congress also has the "authority to proscribe the purely intrastate production, possession, and sale" of goods within

12

that market. *Taylor v. United States*, 579 U.S. 301, 303 (2016). The NFA regulates the national market for certain firearms, so it does not matter that one could produce or possess a firearm without tendering money to another person. *See, e.g.*, *United States v. Bowers*, 594 F.3d 522, 529 (6th Cir. 2010) (rejecting an analogous challenge to the federal ban on child pornography).

Congressional findings regarding effects on interstate commerce—which are not necessary, but which may be "helpful" to the judicial inquiry—suffice here to show that Congress has more than met its "modest" burden. *Raich*, 545 U.S. at 21–22. As explained above, the Gun Control Act was born from Congress's concerns about inadequate controls over the interstate market in firearms. *Rose*, 522 F.3d at 717-19. Accordingly, Congress found it necessary and proper to impose direct regulation on the interstate market. *See, e.g.*, S. Rep. No. 90-1501, at 23–24. It simultaneously reenacted and amended the NFA's provisions reaching intrastate manufacturing and transfers as well. The reason is not hard to discern: absent those provisions, federal law would contain a "gaping hole" by "fail[ing] to regulate the intrastate manufacture and possession of" firearms. *Raich*, 545 U.S. at 22. That is particularly true because there would be inevitable "enforcement difficulties" in distinguishing locally produced and transferred firearms from those moving in interstate commerce. *Id.* Given that, Congress certainly had a "rational basis" for regulating intrastate commerce in firearms. *Id.*

## C.    The 2025 Amendments to the National Firearms Act Are Severable

If Plaintiffs were correct that the recent amendments to the NFA made the law constitutionally defective by setting the making and transfer taxes to $0, the correct remedy would be to invalidate those amendments and leave the remainder of the statute intact. In other words, the Court should limit any remedy to those provisions of the recent amendments—specifically,

13

Section 70436(a) and (b) of Public Law No. 119-21—to the extent that they changed the making and transfer tax rates. *See* 139 Stat. at 247. That result obtains for several reasons.

First, longstanding severability principles require limiting any remedy to the amendment that renders a law unconstitutional. The severability analysis is "clear[]" when Congress enacts "an unconstitutional amendment": "the original statute 'must stand as the only valid expression of the legislative intent.'" *Lindenbaum v. Realgy, LLC*, 13 F.4th 524, 528 n.2 (6th Cir. 2021) (quoting *Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 526–27 (1929)); *accord Barr v. Am. Ass'n of Pol. Consultants, Inc.* ("*AAPC*"), 591 U.S. 610, 630 (2020) (plurality opinion).[4] Applying that principle here, it would be appropriate to sever the "exception" to the NFA's longstanding taxation scheme "'introduced by amendment,' so that 'the original law stands without the amendatory exception.'" *AAPC*, 591 U.S. at 630 (quoting *Truax v. Corrigan*, 257 U.S. 312, 342 (1921)). The pre-amendment NFA was a valid exercise of Congress's taxing power; the Supreme Court has held as much. If Plaintiffs were correct that the 2025 amendments introduced a constitutional defect into the NFA, then the Court should permit the valid version of the law to remain in place.

Second, the Internal Revenue Code's express severability clause reinforces that conclusion. 26 U.S.C. § 7852(a). That clause provides that if "any provision of this title" is held invalid "the remainder of the title . . . shall not be affected thereby." *Id.* Such a clause "appl[ies] equally to the amending provisions" when legislation amends the Internal Revenue Code. *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 402 (5th Cir. 2008) (cleaned up). The severability clause thus makes "clear that Congress would prefer that [the court] use a scalpel rather than a bulldozer in curing the constitutional defect" that Plaintiffs allegedly identify. *Seila L. LLC v. CFPB*, 591 U.S. 197,

---

[4] The portion of the *AAPC* plurality opinion discussing severability is controlling under *Marks v. United States*, 430 U.S. 188 (1977), because seven Justices agreed with that conclusion. *See AAPC*, 591 U.S. at 637 (Sotomayor, J., concurring in the judgment); *id.* at 648 (Breyer, J., joined by Ginsburg and Kagan, JJ., concurring in the judgment).

14

237 (2020). Invalidating an amendment that introduced a constitutional flaw—thereby reverting the statute to its undoubtedly constitutional form—would leave the statute "fully operative" to the maximum extent possible, respecting Congress's role in crafting legislation. *Id.* at 235.

Third, that Congress recently amended the NFA but left the registration provisions "substantially unchanged" confirms that severance is required. *See United States v. Jackson*, 390 U.S. 570, 586–87 (1968) (describing as "inconceivable" the idea that Congress "would have chosen to discard the entire statute" if an amendment were invalidated). Efforts to remove silencers, short-barreled rifles, and short-barreled shotguns from the Act's requirements were considered and rejected during the debate on the 2025 reconciliation bill. The Senate Finance Committee, for example, released draft legislation that would have amended the Act's definition of "firearm" to exclude short-barreled rifles, short-barreled shotguns, and silencers. *See* Senate Finance Comm., *Legislative Text Title VII* (n.d.), https://perma.cc/MVA6-RPU4. But Congress omitted those provisions from the final legislative text. Plaintiffs thus seek to obtain through this lawsuit what Congress recently declined to enact through the legislative process. That would not be a proper exercise of the judicial power. Instead, this Court should sever the amendment because the prior version of the law has undergone bicameralism and presentment, which makes it "the 'valid expression of the legislative intent.'" *AAPC*, 591 U.S. at 630 (quoting *Frost*, 278 U.S. at 526–27).

Finally, severing the amendment would leave the statute "fully operative" and "capable of functioning." *Seila L.*, 591 U.S. at 235. The NFA successfully operated for nearly ninety years before Congress adjusted the tax rates last year. There can be no doubt that the statute would be equally operative if the recent amendments were severed.

15

III.    **The Challenged Provisions Are Consistent with the Second Amendment**

    A.    **The NFA Registration Provisions Are a Presumptively Lawful Shall-Issue Licensing Regime**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms. 554 U.S. at 592. But it emphasized that the "right secured by the Second Amendment is not unlimited." *Id.* at 626. It also noted that "nothing in [its] opinion should be taken to cast doubt on" certain laws, including those "imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. The Court later set forth a two-part framework for analyzing Second Amendment claims in *Bruen*. First, a court considers whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, then the law may still be upheld if it is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

In *Bruen*, the Court applied this framework to conclude that New York's prohibition on possessing firearms in public without a license was unconstitutional. *Id.* at 11–15. The regulation at issue in *Bruen* required applicants for a license to show "proper cause," defined as a "special need for self-protection distinguishable from that of the general community." *Id.* at 12 (citation omitted). It also vested state officials with substantial discretion to issue licenses and provided limited judicial review of those officials' decisions. *Id.* at 12–13. The Supreme Court held that this system violated the Second Amendment. *Id.* at 71. But it also contrasted New York's "may-issue" licensing regime with "shall-issue" regimes that require state authorities to issue licenses "whenever applicants satisfy certain threshold requirements." *Id.* at 13. Shall-issue regimes apply "narrow, objective, and definite standards" to guide licensing officials' decisions. *Id.* at 38 n.9

16

(citation omitted). The Court emphasized that nothing in its analysis of the New York may-issue law "should be interpreted to suggested the unconstitutionality" of such shall-issue laws. *Id.* But it further cautioned that while such licensing regimes are presumptively lawful, they may be subject to as-applied challenges where "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.*

The Fifth and Fourth Circuits recently held that the NFA's taxing and registration requirements for silencers constitute a lawful shall-issue regime. *See Peterson*, 161 F.4th at 339; *United States v. Speed*, 175 F.4th 272, 286 (4th Cir. 2026). As the Fifth Circuit explained, challenges to background checks are controlled by *Bruen*'s "various assurances that it did not disturb common-place regulations in shall issue regimes." *Peterson*, 161 F.4th at 339 (quoting *McRorey v. Garland*, 99 F.4th 831, 834 (5th Cir. 2024)). "*Heller* described conditions and qualifications on the commercial sale of arms as presumptively lawful, and *Bruen* did nothing to disturb that part of *Heller*." *Id.* (cleaned up). The Fifth Circuit thus read "*Bruen* to implement a 'presumption' of constitutionality for shall-issue 'ancillary firearm regulations such as background checks.'" *Id.* (quoting *McRorey*, 99 F.4th at 836–37).

Applying these principles to the case before it, *Peterson* held that the "NFA suppressor-licensing scheme is presumptively constitutional because it is a shall-issue [licensing] regime." *Id.* Under the NFA, ATF will "deny a firearm-making application if the 'making or possession of the firearm would place the person making the firearm in violation of law.'" *Id.* (quoting 26 U.S. § 5822). Such a requirement is "precisely the 'objective and definite' licensing criterion held permissible under *Bruen*.'" *Id.* (quoting *Bruen*, 597 U.S. at 38 n.9 (brackets omitted)). And based on the record before it, the court had "no reason to doubt ... that the NFA's fingerprint, photograph, and background-check requirements are 'designed to ensure only that those bearing

17

arms are in the jurisdiction are, in fact, law-abiding, responsible citizens.'" *Id.* (quoting *Bruen*, 597 U.S. at 38 n.9 (some quotation marks omitted)); *see also Speed*, 175 F.4th at 290(concluding that "the NFA creates a shall-issue permitting regime").

This Court should adopt the same conclusion. Although the only provision at issue in *Peterson* and *Speed* was the NFA's rules governing silencers, nothing about either Court's analysis suggests that the outcome would be any different with respect to the NFA's rules governing short-barreled rifles. And Plaintiffs have introduced no evidence that federal officials have put this regime to "abusive ends" by, for example, imposing "lengthy wait times" or "exorbitant fees." *Bruen*, 597 U.S. at 38 n.9; *accord United States v. Rush*, 130 F.4th 633, 640 (7th Cir. 2025).

**B.    Silencers Are Not "Arms" Within the Meaning of the Second Amendment**

Silencers are not protected by the plain text of the Second Amendment for an independent reason: they are not "Arms" at all. In *Heller*, the Supreme Court stated that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. And it follows that, for this right to have meaning, the Second Amendment must "carry an implicit, corollary right to bear the components or accessories necessary for the ordinary functioning of a firearm," such as ammunition or triggers. *Duncan v. Bonta*, 133 F.4th 852, 866–67 (9th Cir. 2025) (en banc), *petition for cert. docketed*, No. 25-198 (Aug. 19, 2025). "But the text of the Second Amendment also reveals an important limit on the scope of the right": it extends only to the "right to bear <u>Arms</u>." *Id.* at 867. At the time of ratification of the Second Amendment, there was a clear distinction between "weapons themselves, referred to as 'arms,' and accessories of weaponry, referred to as 'accoutrements.'" *Id.* The two were distinct: "For example, the Continental Congress promised to pay States for 'every horse and all arms <u>and</u> accoutrements, which shall be taken, by the enemy in action.'" *Id.* (quoting 2 Public Papers of George Clinton 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900

18

(brackets omitted)) (emphasis in original). Indeed, "[h]undreds of examples from the Founding era describe arms and accoutrements as separate, distinct items of military gear, and the phrase 'arms and accoutrements' was common." *Id.* And by "choosing to protect the right to bear 'arms,' not 'arms and accoutrements,' the Founders constrained the scope of the Second Amendment." *Id.*

Consistent with this understanding, the "overwhelming consensus of courts" have concluded that that silencers are not "bearable arm[s] protected by the Second Amendment." *United States v. Bradley*, 766 F. Supp. 3d 769, 781 (S.D. Ohio 2025) (quotation marks omitted) (quoting *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018)); *see also id.* at 781–82 (collecting cases); *United States v. Berger*, 715 F. Supp. 3d 676, 698–99 (E.D. Pa. 2024) (collecting additional cases). By themselves, silencers cannot "reasonably be described as an item that a person 'takes into his hands, or useth in wrath to cast at or strike another.'" *Duncan*, 133 F.4th at 867 (quoting *Heller*, 554 U.S. at 581). And they are not "necessary for the ordinary operations of a protected weapon." *Id.* at 867. As a result, the "Second Amendment's plain text" does not protect an individual's right to keep or bear them. *Bruen*, 597 U.S. at 24.

### C.     The Challenged Provisions Are Consistent with Our Nation's Historical Restrictions on Dangerous and Unusual Weapons

The challenged provisions are also "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. At this second step of the analysis, the court asks "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692. That requires the government to "identify a historical law that is analogous, or 'relevantly similar,' to the challenged regulation." *United States v. Bridges*, 150 F.4th 517, 524 (6th Cir. 2025) (quoting *Bruen*, 597 U.S. at 28–29). The Supreme Court has identified "two metrics" that guide the analysis: whether the modern and historical regulations impose a "comparable burden on the right of armed self-defense and whether that regulatory

19

burden is comparably justified." *Bruen*, 597 U.S. at 29. This analysis does not mean that the Second Amendment is "trapped in amber." *Rahimi*, 602 U.S. at 691. The historical law "need not be a 'dead ringer' or 'historical twin.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 30). Rather, the court must ascertain whether the challenged laws are "'relatively similar' to laws that our tradition is understood to permit, 'applying faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* at 692 (quoting *Bruen*, 597 U.S. at 29 (brackets omitted)).

The Sixth Circuit has provided further guidance on how this analysis should proceed with respect to statutes that prohibit the possession of certain weapons. *Heller*'s "historical review" demonstrated that the Second Amendment "'was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Bridges*, 150 F.4th at 525 (quoting *Heller*, 554 U.S. at 626). And *Heller* "identified a historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id.* (quoting *Heller*, 554 U.S. at 627 (internal quotation marks omitted)). Thus, the government may, consistent with the Second Amendment, prohibit the possession of an arm if it is "'dangerous and unusual.'" *Id.*

**1.** The Sixth Circuit has already indicated that short-barreled rifles are dangerous and unusual weapons in an unpublished opinion rejecting a challenge to the NFA's prohibition on the possession of short-barreled shotguns. *See United States v. Brooks*, No. 24-5334, 2025 WL 2939404 (6th Cir. Oct. 16, 2025). Indeed, it noted that several other circuits had upheld convictions for the possession of "short-barreled shotguns or rifles." *Id.* at *3 (citing *Rush*, 130 F.4th at 637–38; *United States v. Robinson*, No. 12-12551, 2025 WL 870981, at *5 (11th Cir. Mar. 20, 2025) (per curiam), and *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at * 1 (4th Cir. Dec. 12, 2024) (per curiam)). The Sixth Circuit had "no trouble concluding that short-barreled shotguns are dangerous and unusual," explaining that an object is "'dangerous' if it is 'likely to cause serious

bodily harm" and that "[s]hort-barreled shotguns plainly meet th s definition." *Brooks*, 2025 WL 2939404 at *2 (internal quotation marks and citations omitted).

The Sixth Circuit also held that short-barreled shotguns are unusual because they are not "in common use or typically possessed by law-abiding citizens for lawful purposes like self-defense." *Id.* (quoting *Bridges*, 150 F.4th at 525-526 (internal quotation marks omitted). That conclusion followed from the Supreme Court's decision in *United States v. Miller*, 307 U.S. 174 (1939). The defendants there were charged with unlawfully transporting a shotgun with a barrel less than 18 inches in length in violation of the NFA. *Id.* at 175. After examining early colonial laws regulating musket length, *id.* at 178–82, the Court upheld this provision against a Second Amendment challenge, *id.* at 178. It reasoned that because short-barreled shotguns did not have any "reasonable relationship to the preservation or efficiency of a well regulated militia," it could not say that the "Second Amendment guarantees the right to keep and bear such an instrument." *Id.* It further noted that there was no evidence in the record or anything "within judicial notice" that might establish that short-barreled shotguns were "part of the ordinary military equipment or that its use could contribute to the common defense." *Id. Heller* would later explain that *Miller* stands for the proposition that "the *type of weapon at issue*"—a short-barreled shotgun—"was not eligible for Second Amendment protection." 554 U.S. at 622.

"Putting these pieces together," the Sixth Circuit held that the Second Amendment does "not guarantee the right to possess an unregistered gun that is dangerous and unusual." *Brooks*, 2025 WL 2939404, at *3. *Miller* held that "short-barreled shotguns are not in common use for lawful purposes," and *Heller* "suggested the same." *Id.* The parties "presented no evidence to suggest that short-barreled shotguns are typically possessed by law-abiding citizens for lawful purposes today." *Id.* Short-barreled shotguns are "excessively dangerous weapons ill-suited and

disproportionate" for self-defense. *Id.* (cleaned up). The Sixth Circuit had little trouble concluded that "short-barreled shotguns "are 'unusual' under *Heller.*" *Id.* (cleaned up).

Short-barreled rifles are no different. Like short-barreled shotguns, short-barreled rifles are "dangerous because they are more powerful than traditional handguns yet are easier to conceal." *Rush*, 130 F.4th at 637. Both "involve a characteristic that makes the firearm especially attractive to criminals while adding little—if any—functionality to the firearm for lawful use." *Id.* Short-barreled rifles are also unusual—as in *Brooks*, Plaintiffs have introduced no evidence that short-barreled rifles "are typically possessed by law-abiding citizens for lawful purposes today." 2025 WL 2939404, at *3. While Plaintiffs list possible "common, legal uses" for these weapons, *see*, they have introduced no evidence that these weapons are *commonly used* for such purposes. On the contrary, the NFA regulates these short-barreled rifles precisely because they are "likely to be used for criminal purposes." *Thompson/Ctr. Arms*, 504 U.S. at 517 (plurality opinion). Long guns with shortened barrels are attractive to criminals because their "concealability fosters [their] use in illicit activity" and because of their "heightened capability to cause damage." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (citation omitted)); *see also Johnson v. United States*, 576 U.S. 591, 640 (2015) (Alito, J., dissenting).[5]

**2.** Silencers are also dangerous and unusual weapons. They are "likely to cause serious bodily harm." *Brooks*, 2025 WL 2939404, at *2 (internal quotation marks and citations omitted).

---

[5] Plaintiffs also argue that short-barreled rifles and silencers are commonly used for self-defense purposes by pointing to the number of short-barreled rifles and silencers that Americans currently own. Dkt. No. 18 at 33. But courts have routinely refused to ground their assessment of whether a weapon is commonly *used* for self-defense based on "on numbers alone." *Bevis v. City of Naperville*, 85 F.4th 1175, 1198–99 (7th Cir. 2023). Such an analysis would be at odds with *Heller*'s "choice of the phrase common *use* instead of common *possession.*" *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc). And it would lead to absurd consequences by allowing any weapon—even machine guns or portable nuclear weapons—to become constitutionally protected "merely because it becomes popular before the government can sufficiently regulate it." *Id.*

22

And Plaintiffs have introduced no evidence that silencers are commonly used for lawful purposes. On the contrary, courts have long recognized that "a silencer is practically of no use except for a criminal purpose." *United States v. Fortes*, 141 F.3d 1, 7 (1st Cir. 1998)

### D.    The Challenged Provisions Are Relevantly Similar to Additional Historical Regulations

Because the challenged provisions do not prohibit the possession of short-barreled rifles and silencers, they are permissible under other historical traditions. As the Seventh Circuit concluded in rejecting a Second Amendment challenge to the NFA's regulations of short-barreled rifles, there are "numerous historical regulations on barrel length, regulations on firearms trade, registration and taxation requirements, and regulations on dangerous and unusual weapons." *Rush*, 130 F.4th at 641. With respect to barrel length, in 1649, Massachusetts adopted a law that required musketeers to carry a "good fixed musket . . . not less than three feet, nine inches, nor more than four feet, three inches in length." *Miller*, 307 U.S. at 180. In 1785, Virginia adopted a law regulating the length of militia members' firearms, providing that "every non-commissioned officer and private' shall be equipped 'with a good, clean musket carrying an ounce ball, and three feet eight inches long in the barrel." *Id.* at 181. Although these laws are specific to militia members, they are "relevant because the traditional militia was formed from a pool of men bringing arms in common use at the time for lawful purposes." *Rush*, 130 F.4th at 641.

Additionally, there are many "colonial and post-colonial laws akin to modern-day registration and taxation requirements." *Id.* In 1631, Virginia required the recording of "arms and munitions." Virginia Act of Feb. 27, 1631, Act LVI. The Founders "implemented mandatory musters which required individuals with a gun to show up and register their firearm." *United States v. Holton*, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022) (quotation marks omitted); *see* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 27-

23

28 (2006) (collecting these laws).[6] In addition, States imposed taxes on personally held firearms "well into the 1800s." *Holton*, 639 F. Supp. 3d at 711; *see* Robert Spitzer, *Gun Law History in the United States and the Second Amendment*, 80 Law & Contemp. Probs. 55, 76–77 (2017) (collecting laws from between 1851 and 1867). More generally, "colonial governments substantially controlled the firearms trade," including by restricting the sale of guns. *Teixeira v. Cnty. Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc)).

Also relevant are laws "enacted around the time of the founding, which prescribed fines, taxes, or sureties on gun possession or use for violence prevention purposes." *Rush*, 130 F.4th at 642. Included among these are a "1759 New Hampshire law that called for the arrest and fine of those who 'go armed offensively' and allowed justices of the peace to 'commit the offender to prison, until he or she finds such sureties for the peace and good behavior.'" *Id.* (citation omitted). A 1763 New York law "condemned carrying or shooting any 'Musket, Fowling-Piece, or other Fire-Arm whatsoever' in certain areas of 'New York City or the Liberties thereof, without a Licensing Writing first and he, she, or they so offending, shall forfeit and pay the Sum of Twenty Shillings' per offense." *Id.* at 642–43 (citations omitted). Southwark (today, Philadelphia) also passed laws in 1774 and 1794 that imposed fines "for discharging a firearm within a certain distance of any building, and later 'within the regulated parts of the district, without the permission of the president of the board of commissioners,' respectively." *Id.* at 643 (citations omitted). Furthermore, there are several historical analogues for "regulating dangerous and unusual weapons." *Id.* Under English common law, "the offence of riding or going armed, with dangerous

---

[6] Various colonies and early States also recorded the weapons individuals reporting to a muster brought with them. *See, e.g., Mecklenburg County: A List of Men under Captain Alexander, North Carolina Digital Collections*, https://perma.cc/JUM2-ZL7N; *Return of Arms and Accoutrements in Jeremiah Olney's Company, June 10, 1776, The Rhode Island Historical Society*, https://perma.cc/TT6U-5UFB.

24

or unusual weapons, [was] a crime." 4 William Blackstone, *Commentaries on the Laws of England* 148–49 (1769). Similarly, under the common law of the United States a person was "prohibited from 'arming himself with dangerous and unusual weapons, in such a manner as would naturally cause a terror to the people.'" *Rush*, 130 F.4th at 643 (citation and alterations omitted)); *see also Bruen*, 597 U.S. at 46 (identifying similar laws from colonial times).

These laws are "relevantly similar" to the challenged provisions. *Bruen*, 697 U.S. at 29. They place a "comparable burden on the right to armed self-defense." *Id.* With the making and transfer taxes reduced, the only burden is the occupational tax and the requirement to register a firearm and, for manufacturers, makers, and importers, inscribe a serial number. Such minimal requirements have "little impact on lawful possession for armed self-defense." *Rush*, 130 F.4th at 643. Indeed, it is far less of a burden than regulations that prohibit individuals from possessing dangerous and unusual weapons altogether. The rationales underlying the NFA and these historical laws are also relevantly similar. Throughout our history, "there has stood an unbroken line of common sense regulations permitting our duly elected representatives to limit weapons where the likely use of the weapon is a violent breach of the peace." *Id.* at 643. "Such is the unmistakable purpose of surety laws, riding while armed limitations, and the long-recognized need to place dangerous and unusual weapons in a category of their own." *Id.* And that is why Congress regulated NFA firearms: because they are "likely to be used for criminal purposes," *Thompson/Center Arms*, 504 U.S. at 517 (plurality opinion).

## CONCLUSION

The Court should grant Defendants' motion for summary judgment and deny Plaintiffs' motion for summary judgment.

June 3, 2026                                        Respectfully submitted,

25

/s/ Simon C. Brewer

Samuel P. Siegel* (DC Bar No. 90035964)
Rupa Bhattacharyya* (DC Bar No. 1631262)
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
AND PROTECTION
GEORGETOWN LAW
600 New Jersey Ave. NW
Washington, DC 20001
(202) 662-4048
(202) 661-6730 (fax)
ss5427@georgetown.edu
rupa.bhattacharyya@georgetown.edu

Simon C. Brewer* (DC Bar No. 90042403)
Ryan Cooper* (DC Bar No. 1645301)
Joel McElvain* (DC Bar No. 448431)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
(202) 796-4426 (fax)
sbrewer@democracyforward.org
rcooper@democracyforward.org
jmcelvain@democracyforward.org

*Counsel for Amici Curiae City of Baltimore, MD;
City of Columbus, OH; and Harris County, TX*

\* *Motion for admission pro hac vice forthcoming.*